Kenneth X. WATKINS, a/k/a
Anthony Jackson
v.
Robert L. JOHNSON, Superintendent, State Correctional Institution, Graterford, Pennsylvania.

Civ. A. No. 72–2381.

United States District Court,
E. D. Pennsylvania.

May 14, 1974.

Steven G. Scott, Law Student, University of Pa. Law School, Indigent Prisoner Litigation Program, Philadelphia, Pa., for plaintiff.

Michael Minkin, Asst. Atty. Gen., of Pa., Philadelphia, Pa., for defendant.

HIGGINBOTHAM, District Judge.

## MEMORANDUM OPINION

Unlike so many actions brought under Section 1983,[1] we are not here confronted with a factual milieu dissimilar to recently decided cases. Plaintiff is an inmate at the State Correctional Institution at Graterford, Pennsylvania. He claims that the circumstances of his transfer from the general prison population to administrative segregation after his arrest and arraignment on two counts of conspiracy, two counts of assault by a prisoner, and two counts of assault and battery did not comport with the minimal standard of fairness which is the desideratum of Fourteenth Amendment Due Process. Additionally, he argues that the conditions under which he was confined constitute the infliction of Cruel and Unusual Punishments prohibited by the Eighth Amendment. Plaintiff's factual allegations, on at least a conclusory level, are of the same magnitude as those raised before Judge Davis in the case of Ford v. Sielaff, Civ. No. 72–2244 (E.D.Pa., February 22, 1973) aff'd. 491 F.2d 749 (3d Cir. 1974) and of equal significance the case appears to have arisen from the same disturbance, in the same prison, and to have involved many of the same individuals who were involved in *Ford*. While I am fully sensitive to the close and liberal scrutiny which the Court of Appeals of this Circuit requires in behalf of prisoners' allegations, in this instance plaintiff is far short of the minimum showing required to defeat defendant's motion for summary judgment.

I.

The instant litigation arises out of a violent prison disturbance on July 27, 1972 involving a number of inmates at the State Correctional Institution at Graterford, Pennsylvania. During the disturbance several inmates were stabbed and beaten, and the plaintiff, Anthony Jackson, was identified as one of the perpetrators of the attack as well as an aggressor in the ensuing fray. After an investigation of the incident by the Pennsylvania State Police, Jackson and seventeen other inmates were arrested on criminal charges. The arrest warrants were executed on September 14, 1972, and all eighteen men were arraigned before a magistrate to answer criminal charges. Following the arraignment but on that same day, twelve of the eighteen men were transferred from Graterford to other institutions, and the remaining six were returned to Graterford where they were confined in maximum security one-man administrative detention cells. Anthony Jackson was one of the six men.

The defendant, Superintendent of Graterford Robert L. Johnson, explained the reason for the confinement of Jackson in his affidavit. He states:

"... Anthony Jackson was segregated from the general population pursuant to institution policy which requires that the perpetrators of an attack on other inmates are segregated for the safety of the victims of the original attack, as well as the safety of the perpetrators who might be targets of retaliation by the victims of the original attack. This procedure is effective upon identification

of the perpetrators of an attack upon other inmates. In this case the identification was made by Pennsylvania State Police on or about September 14, 1972."[2]

On September 21, 1972, one week after the beginning of his confinement in administrative segregation, Jackson was brought before a District Justice of the Peace in Montgomery County for a preliminary hearing. At the conclusion of this hearing, the judge ruled that Jackson was to be held over for trial on charges of assault by a prisoner, assault and battery, and conspiracy.

Jackson remained in administrative detention a total of eighty-five days. During that period on October 19, 1972, Jackson notified Superintendent Johnson by an Inmate's Request to Staff Member that he believed his constitutional rights were being violated. Four days later on October 23, 1972, Johnson responded, informing Jackson that he was being segregated for administrative purposes because he had been charged with a serious offense against another resident of the institution. On December 7, 1972, Jackson was removed from administrative segregation.

Plaintiff brings the present damage action under the 1871 Civil Rights Act, 42 U.S.C. § 1983. The defendant has filed a Motion for Summary Judgment relying upon affidavits and exhibits. The plaintiff has filed a memorandum in opposition to the motion and also submits affidavits, defendant's answers to interrogatories, and other exhibits. At the present juncture of the case plaintiff asserts two legal theories:

1. That Johnson's decision to place him in administrative segregation was not reached through procedures conforming to Fourteenth Amendment Due Process standards; and

2. That the conditions of his confinement violated the Eighth Amendment and Fourteenth Amendment proscription against the infliction of Cruel and Unusual Punishments.

## II.

In defense to plaintiff's due process claim, defendant relies primarily upon the case of Ford v. Sielaff, *supra*, as decisive and compelling precedent for granting his summary judgment motion on the present record. Albert Ford was also one of the eighteen inmates arrested and arraigned September 14, 1972 on criminal charges arising from the July 27th disturbance at Graterford.[3] Similarly, Ford was returned to Graterford and confined in the administrative detention gallery after his arraignment. Ford filed his Section 1983 damage action against the Commissioner of the Bureau of Corrections, Allyn R. Sielaff, and Robert L. Johnson as Superintendent of Graterford; he raised the constitutional due process issue in his complaint and cited the same authority presently relied upon by Jackson. Defendants filed summary judgment motions in which the affidavit of Superintendent Johnson stated the same prison policy for Ford's segregation as is related here for the segregation of Jackson.[4] In *Ford* the summary judgment motion was granted by the District Court and the Court of Appeals affirmed the District Court judgment.

There is little on the present record to distinguish it from the record in *Ford*. Both men, while incarcerated at the same institution were arrested and arraigned on similar charges[5] arising from the same prison disturbance.

---

2. Defendant's Motion for Summary Judgment and Supporting Memorandum of Law, Doc. # 23, Exhibit "B", p. 2, ¶ 9.

3. See Plaintiff's Answers to Interrogatories, Doc. # 19, ¶1.

4. Ford v. Sielaff, Civ.No. 72-2244 (E.D.Pa., filed December 4, 1972) Doc. # 9, Exhibit "1", ¶ 9.

5. Since Ford was serving a life sentence at the time of the disturbance, he was charged with assault by a life prisoner instead of mere assault by a prisoner. This is the only variance between the charges brought against Ford and those brought against Jackson.

**1008**

They were charged pursuant to an independent investigation of the State Police and were arraigned and transferred to administrative segregation on the same day. Each man was given a preliminary hearing on the same day, September 21, 1972, and each was held over for trial after the hearing. Finally, each prisoner was transferred to administrative segregation pursuant to the same institutional policy as related by the affidavit of Superintendent Johnson which clearly appears on the record of the *Ford* case as well as on the present record. Admittedly Jackson has been represented here by most able counsel while Ford pursued his claims *pro se,* but the facts are clear upon the record of both cases.

■ On the question of the due process requirement of notice and opportunity to respond or the necessity for an evidentiary hearing, it is significant that Jackson was held over for trial after his preliminary hearing on September 21, 1972, only seven days after his transfer. Under the Pennsylvania Rules of Criminal Procedure if the Commonwealth does not establish a prima facie case against the accused, he must be discharged.[6] The accused has the right to have counsel represent him, to cross-examine witnesses, to present evidence and to compel the appearance of witnesses to testify in his behalf.[7] Clearly Jackson's preliminary hearing afforded him all the procedural rights and safeguards mandated by the due process clause. The magistrate's ruling that Jackson be held for trial, while not a pronouncement of criminal guilt, does constitute a judicial finding that the criminal charges are supported by facts which have been rationally determined and which are legally sufficient to establish a prima facie case.

My reading of the case of United States ex rel. Tyrrell v. Speaker, 471 F. 2d 1197 (3d Cir. 1973) does not lead me to a conclusion different from that reached in Ford v. Sielaff, *supra.* The

*Tyrrell* decision, also cited by Judge Davis in his opinion granting summary judgment in *Ford,* does not address the procedural due process question in a factual context even remotely similar to the instant case. In *Tyrrell* the plaintiff inmate was segregated as a punitive measure because of certain criminal charges made against him while incarcerated at another institution. The plaintiff had been placed in custody originally after his arrest on charges of robbery and shooting a police officer. While awaiting trial at Delaware County Prison, Tyrrell was charged with attempting a prison break. He was subsequently classified as a security risk and transferred to Graterford Prison where he was confined to punitive segregation. In opposition to a summary judgment motion on the procedural due process issue Tyrrell asserted "that there was no basis for the decision to classify him as a security risk and transfer him to Graterford and that such decision was arbitrary, capricious, and motivated by a prejudice against him arising out of his having been charged with shooting a police officer, . . ." *Id.* at 1200.

Unlike Tyrrell, Jackson was charged with participating in a prison riot during which he allegedly beat and stabbed a number of his fellow inmates. The Superintendent did not indicate that he transferred Jackson based upon a policy of punishing prisoners guilty of such charges, but rather because of the potentially dangerous situation of allowing the attacker and the victim to remain in the same general prison population where violence might erupt a second time. Jackson was therefore immediately transferred after he was identified by the State Police arresting officer as the perpetrator of the attack. Gurczynski v. Yeager, 339 F.2d 884 (3d Cir. 1964). *Cf.* Ford v. Sielaff, *supra.*

■ Plaintiff strives to distinguish *Ford,* because, he asserts, his theory on the procedural due process issue was not articulated by Ford and therefore was

6. Pa.R.Crim.P. 120(c).

7. Pa.R.Crim.P. 120(b), 122.

not considered by Judge Davis or the Court of Appeals. Plaintiff argues that the essence of his deprivation lies in the failure of the prison authorities to provide for him a hearing "on the issue of whether it was necessary for protective purposes to separate plaintiff from his alleged victims."[8] Unfortunately, no cases have been cited that stand for the proposition that a prisoner transferee is entitled to such a hearing. No such proposition can be reasonably inferred from the holding in Gray v. Creamer, 465 F.2d 179 (3d Cir. 1972). That case held that the transfer of a prisoner from the general prison population to solitary confinement without either a hearing or notice of the charges and an opportunity to respond did not meet minimal due process requirements. However, the Court quoted the following language from Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir. 1971):

"If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be *premised on facts rationally determined.* This is not a concept without meaning. In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, . . . and afforded a reasonable opportunity to explain his actions."

(Citations and footnote omitted. Emphasis added.)

By the above language the clear import of Gray v. Creamer, *supra,* is that plaintiff does have the right to challenge the facts upon which the administrative judgment of separation is based—that is, the policy of separation of plaintiff from his alleged victims may be subject to scrutiny in terms of whether a factual nexus was established that as to plaintiff there were actual victims of his alleged attack in a prior fracas. But Gray clearly does not reach the question of whether Jackson is entitled as a matter of procedural due process to a hearing on issues beyond this factual inquiry. In the context of the present factual setting, the substance of counsel's argument is that Warden Johnson was constitutionally bound to hold a hearing to consider any evidence and argument in mitigation against the decision to segregate Jackson from the general prison population even though that decision was based on facts rationally determined. Despite the broad liberality of *Gray* (which is probably the most liberal case of its type in any Circuit) I do not read it as holding that the implementation of this policy in the present case has deprived plaintiff of any constitutional due process rights. Similarly, I do not read *Gray* as holding that a policy of a prison warden designed to separate an attacker from his victims is, from any viewpoint, constitutionally deficient. Therefore, I hold that the policy of separating victims from their attackers is constitutionally permissible and that upon the facts of the present record this policy was not implemented in a manner which deprived plaintiff of any constitutionally protected rights.

### III.

In examining plaintiff's Eighth Amendment claim, I am guided by the opinion in United States ex rel. Bracey v. Rundle, 368 F.Supp. 1186, 1191 (E.D. Pa.1973) in which conditions of segregated confinement quite similar to those alleged here were also given close judicial scrutiny. In surveying the law in this area the Court stated:

"The strictures of the Eighth Amendment are not static. Their scope changes as society changes. 'The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' Trop v. Dulles, 356 U.S. 86, 101, [78 S.Ct. 590, 598, 2 L. Ed.2d 630] (1958). Solitary confinement is not *per se* cruel and un-

---

8. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Doc. # 24, p. 5.

usual punishment, Sostre v. McGinnis, 442 F.2d 178, 192 (C.A. 2, 1971), nor are all harsh penalties or severe conditions of confinement forbidden by the Eighth Amendment. *See* Robinson v. California, 370 U.S. 660, [82 S.Ct. 1417, 8 L.Ed.2d 758] (1962). The punishment proscribed by the Eighth Amendment has been variously defined as conditions which are 'so foul, so inhuman, and so violative of basic concepts of decency,' Wright v. McMann, 387 F.2d 519 (C.A. 2, 1967); punishment which is 'barbarous' or 'shocking to the conscience', Church v. Hegstrom, 416 F.2d 449, 451 (C.A. 2, 1969); and 'physical and mental abuse or corporal punishment of such base, inhumane, and barbarous proportions so as to shock a court's sensibilities * * * ', Burns v. Swenson, 430 F.2d 771 (C.A. 8, 1970). *See also* Lareau v. MacDougall, 473 F.2d 974 (C.A. 2, 1972); Sostre v. McGinnis, supra."

██ The cell to which plaintiff was initially confined [9] on September 14, 1972 was furnished with a toilet, a sink and a bed with mattress and blanket. There was no hot water provided and there was no lighting except that which came from the cell corridor. The nearest window was located six feet from the cell and across the cell corridor. Plaintiff claims that this window normally remained closed. During this initial confinement Jackson was permitted to exercise for fifteen minutes a day in the company of another inmate. He was fed in his cell, permitted commissary privileges and legal materials, and he was allowed two showers per week. He was not totally isolated, for there were inmates in the cells immediately adjoining Jackson's cell. The furnishings, lighting conditions, and ventilation for plaintiff's cell were undoubtedly quite spartan as were the privileges plaintiff was permitted, but these conditions, though harsh, are clearly not of a quality that could be characterized as barbarous, inhumane, foul, or shocking to the conscience.

██ In further support of his Eighth Amendment claim plaintiff has related the occurrence of certain incidents,[10] some involving the conduct of other prisoners, which are not admitted by defendant but which for purposes of this motion I must treat as true. Of course I recognize that a prison administrator's tolerance of certain patterns of conduct can subject him to civil liability for the infliction of Cruel and Unusual Punishments. *E.g.*, Wright v. McMann, 460 F.2d 126, 134 (2d Cir. 1972); Landman v. Royster, 333 F.Supp. 621 (E.D. Va.1971); Jones v. Wittenberg, 330 F. Supp. 707 (N.D. Ohio 1971); Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark. 1970); Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa.1969), aff'd. 435 F.2d 1255 (3d Cir. 1970), cert. denied 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971). While I do not find that under no circumstances would the incidents alleged constitute Cruel and Unusual Punishments, I need not consider these incidents, even accepting them as true, for as to this specific defendant none of these occurrences have been attributed to his personal conduct or negligence. I find not the slightest inference from the circumstances alleged that Johnson either intentionally, recklessly, or even through negligence, caused or contributed to the occurrence of these events. Curtis v. Everette, 489 F.2d 516, 521 (3d Cir. 1973); Howell v. Cataldi, 464 F.2d 272, 279 (3d Cir. 1962); Landman v. Royster, 354 F.Supp. 1302,

9. Though remaining in administrative segregation, Jackson was transferred from his original cell to a cell in the B-Block Gallery on November 3, 1972. This cell was furnished with a light, a window, and was provided with hot water. Also, while in B-Block Jackson was permitted to eat in the dining room, to have earphones for radio, and was permitted television privileges.

10. Jackson alleges that on two or three occasions he was forced to inhale "mace" chemical vapors; that on five occasions he was forced to inhale smoke from dangerous fires; that on several occasions he was bombarded with rotten food, defecation, urine, and other foul substances thrown by nearby prisoners and that on one occasion his food arrived at his cell befouled with similar substances.

1316 (E.D.Va.1973). *Cf.* Bracey v. Grenoble, 494 F.2d 566 (3d Cir. 1974). In Curtis v. Everette, *supra*, the Court of Appeals affirmed the dismissal of a prisoner's civil rights complaint against a Pennsylvania prison superintendent stating:

"Assuming that there is a duty under Pennsylvania law to make reasonable efforts to keep plaintiff in 'safe custody,' there is no allegation of facts indicating intentional action by these defendants 'under color of' state law subjecting plaintiff or causing plaintiff to be subjected to deprivation of his civil rights. * * * This court has repeatedly held that conclusory allegations, such as 'intentionally, wilfully and recklessly,' without supporting facts are not sufficient to make out a complaint under 42 U. S.C. § 1983. . . ." [*Id.* at 521.]

For these reasons I am dismissing the complaint as to those allegations arising from the incidents pled by plaintiff. As to the physical condition of his cell and the limited privileges he was permitted, I hold that these alone do not constitute Cruel and Unusual Punishments.