Joseph **FIDTLER**, Appellant,

v.

A. T. **RUNDLE**, Supt. State Correctional Inst. at Graterford Pa., et al.

and

**Edward T. Hendricks.**

No. 73–1668.

United States Court of Appeals, Third Circuit.

Argued Jan. 8, 1974.

Decided May 13, 1974.

As Amended May 24, 1974.

---

Gilbert E. Geldon, Law Student, Indigent Prisoner Lit. Program, Philadelphia, Pa., for appellant; Ralph S. Spritzer, Supervising Atty., Indigent Prisoner Lit. Program, Philadelphia, Pa., of counsel.

Michael Minkin, Asst. Atty. Gen., Chief, Civ. Lit. Eastern Regional Office, Philadelphia, Pa., for appellee Alfred T. Rundle.

Wanda P. Chocallo, Asst. City Sol., Philadelphia, Pa., for appellee Edward T. Hendricks.

Before ADAMS, HUNTER and WEIS, Circuit Judges.

OPINION OF THE COURT

ADAMS, Circuit Judge.

The issue presented in this appeal is whether the district court erred in holding, on the basis of the record before it, that the superintendent of the State Correctional Institution at Graterford (Graterford), cannot be held liable for damages in a suit brought by a prisoner under 42 U.S.C. § 1983. The district court's conclusion that appellee Alfred T. Rundle, the superintendent, could not be held personally liable for damages prompted it to grant Rundle's motion to dismiss and also to dismiss appellant Joseph Fidtler's action against appellee Edward T. Hendricks, former superintendent of the Phildelphia County Jail (Holmesburg). The district court held no hearing and made no findings with respect to the nature of the duties of Rundle and Hendricks, "nor did it conduct evidentiary proceedings with respect to the good faith defense."

The following facts concerning Fidtler's confinement may be extracted from the various submissions constituting the record in the case. Sometime in 1968, Fidtler was charged with the state crime of aggravated robbery. Because he was unable to post the bond necessary to secure release pending a determination of guilt or innocence, he was incarcerated at Holmesburg. Fidtler objected to being required to perform work while unconvicted and unsentenced, and instituted a civil rights action against Hendricks. On October 31, 1968, the district court, with the consent of the parties, entered a preliminary injunction which, by its terms, "restrained [Hendricks] from compelling [Fidtler] to work until such time as he may have been sentenced."

In December, 1968, Fidtler was convicted of aggravated robbery. Pending sentence, bail was set at $10,000 and since Fidtler was unable to post this amount his confinement at Holmesburg continued. On June 12, 1969, however, Fidtler, still unsentenced, was transferred to Graterford in order to relieve the overcrowded conditions at Holmesburg. Rundle, the superintendent at Graterford, assigned Fidtler to work in the prison laundry.[1] Fidtler worked in the Graterford laundry until April 3, 1970, when he was returned to Holmesburg. On May 1, 1970, Fidtler was sentenced to a term of not less than four years nor more than ten years.

The gravamen of Fidtler's complaint centers upon his enforced toil in the Graterford laundry between June 12, 1969 and April 3, 1970. He seeks compensatory damages, computed on the basis of the prevailing hourly wage rate for laundry-type labor in the Philadelphia area, and also punitive damages.

Fidtler asserts that compelling him to perform labor in the prison while he remained unsentenced constituted "involuntary servitude," which is proscribed by the thirteenth amendment. Furthermore, intertwined with Fidtler's contentions with respect to the thirteenth amendment seems to be a postulate, as yet undeveloped, that Rundle, in requiring Fidtler to work while unsentenced, was performing an exclusively judicial function, i. e., sentencing persons convicted of crimes, in violation of the due process clause of the fourteenth amendment.[2] It is on the basis of these alleged violations of his civil rights that Fidtler invokes section 1983.

The district court did not reach the merits of Fidtler's constitutional claims

---

1. Rundle asserts in an affidavit dated December 5, 1969 that "Joseph Fidtler . . . was assigned to work in the institution laundry by the Vocational Staff." If there should be a determination that Rundle is not otherwise protected from suit, he may nonetheless avoid liability by establishing, at a hearing on the merits of Fidtler's allegation, that he is not the official responsible for the claimed deprivation of constitutional rights.

2. Cf. Note, Procedural Due Process at Judicial Sentencing for a Felony, 81 Harv.L.Rev. 821, 824 (1968) ("[I]t seems basic to a scheme of 'ordered liberty,' that whenever organized society undertakes to impose punitive physical restraint on an individual, it should do so only by regular procedures established in advance. And these procedures should be carried out under the aegis of a judge. . . .")

in granting the pretrial motions of Rundle and Hendricks. Instead, the district court held that since Rundle, in requiring Fidtler to work, was heeding the command of a Pennsylvania statute which had not been held invalid,[3] he was insulated, apparently because of the good faith defense, from damage liability under the language of the Supreme Court's decision in Pierson v. Ray[4] for acts transgressing the constitutional rights of Fidtler. Further, the district court concluded that Hendricks' failure to notify Rundle, on the occasion of Fidtler's transfer to Graterford, that an injunction was outstanding forbidding Hendricks to compel Fidtler to toil until he had been sentenced, was "of no moment." Rundle, the district court reasoned, could not be ordered by a court, assuming that the injunction would run against Rundle, to disregard his statutory duties.

On appeal, Fidtler reiterates his constitutional claims. As already indicated, the district court did not reach the merits of these constitutional claims, and for reasons set forth *infra* we also do not address them. For the purposes of this appeal, two additional contentions of Fidtler are to be considered. First, he asserts that the district court erred in construing the Pennsylvania statute to obligate Rundle to require him to work while incarcerated, although still unsentenced. Second, he contends that, apparently in response to the claims of the appellees, the district court did not correctly discern and apply the standards relating to immunities and defenses available to state officers in section 1983 actions.

Rundle, on the other hand, asserts that, on the basis of *Pierson*, he "was immune from suit," and, in effect, maintains that the district court properly dismissed the complaint without further proceedings.

At oral argument, counsel for Fidtler stated that Fidtler sought reversal of the district court judgment only insofar as it resulted in dismissal of the complaint against Rundle and that he was not pressing his claim against Hendricks. We, therefore, need decide only whether the district court was warranted in dismissing the complaint as to Rundle.

Further, we shall deal solely with Fidtler's contention that the district court erred with respect to its treatment of Rundle's claim that common law immunities and defenses foreclose Fidtler's section 1983 suit; for, as will be shown, the district court did not treat correctly these claims asserted by Rundle and, for this reason, reversal is required.

## I. THE AVAILABILITY OF COMMON LAW IMMUNITIES AND DEFENSES IN SECTION 1983 SUITS.

The law of immunities and defenses available to public officials in section 1983 suits is complicated. This is so because the legal principles emerge from attempts to strike a balance between two important, but often conflicting public policies. On the one hand there is the public interest in vindicating individual rights sought to be protected by the Civil Rights Act. On the other hand, there exists a strong public policy in promoting spirited service by public servants, a goal thought to be placed in jeopardy by the threat of private damage suits for official actions.[5]

---

3. Pa. Stat. title 61, § 141 provides that ". . . wardens . . . are directed to employ the *convicts* under their control for and in behalf of the state." (emphasis added) The district court held that the term "convicts" referred to prisoners adjudged guilty but not yet sentenced, as well as to those who had also been sentenced. Construing the provision in this way suggests that Rundle would be under a statutory duty to demand that Fidtler work.

4. 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The district court relied on the Supreme Court's discussion in *Pierson* of the common law good faith defense to false arrest. The Supreme Court suggested that an officer would not be liable for damages if he was "acting under a statute which he reasonably believed to be valid." *Id.* at 555.

5. *See* Scheuer v. Rhodes, —— U.S. ——, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Before specifically considering Fidtler's contention that the district court's dismissal of the complaint against Rundle was improperly based on immunities and defenses, it is necessary to outline the nature and extent of the protection from damage liability presently afforded state officials in suits brought under section 1983.[6] Although no protection from damage liability is expressly provided for in section 1983, federal courts, recognizing the similarities between many constitutional violations alleged in section 1983 suits and common law torts, such as false arrest and false imprisonment, have permitted defendants in some section 1983 suits to assert immunities and defenses available in common law actions.

In *Pierson*, the Supreme Court concluded that "[t]he legislative record gives no clear indication that Congress [in enacting section 1983] meant to abolish wholesale all common-law immunities." 386 U.S. at 554. It pointed out that earlier, in Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), the Court had held that section 1983 did not affect the common law immunity of legislators. Recently, in Scheuer v. Rhodes,[7] the Supreme Court offered the following elaboration of the immunity available to executive officers in section 1983 suits:

These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation dependent upon the scope of the discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with a good faith belief, that affords basis for qualified immunity of executive officers for acts performed in the course of official conduct.[8]

In addition, Chief Judge Seitz has recently pointed out, citing Bauers v. Heisel,[9] that "[w]hile some courts have stated that § 1983 should be read as limiting the immunity recognized at common law, this Court, sitting in banc, has ruled that § 1983 does not abrogate immunities recognized at common law." [10]

■ The Supreme Court in *Pierson*, of course, also allowed the good faith defense in a section 1983 action. Thus, at least to some extent, the immunities and defenses allowed at common law are available in section 1983 suits.

## II. A FEDERAL COMMON LAW OF IMMUNITIES AND DEFENSES APPLICABLE TO SECTION 1983 SUITS.

■ Under the teachings of *Scheuer, Pierson* and *Tenney,* we must, therefore, determine whether a superintendent of a state prison, Rundle, is entitled to any of the protections provided by the common law. We note that particular legal rules regarded as part of the common law of one jurisdiction may not be followed by the courts in a second jurisdiction. Some would assert that "the

Much of the complexity in this area of the law may be attributed to the difficult-to-grasp, and perhaps ill-conceived, distinction between "discretionary" and "ministerial" official functions. *See, e.g.,* Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

6. The Supreme Court established in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed. 2d 492 (1961), that an individual injured by the acts of state officials that violated his civil rights had a cause of action against those officials for damages under section 1983.

7. ── U.S. ──, 94 S.Ct. 1683, 40 L.Ed.2d 90 (April 17, 1974).

8. *Id.* at 4548, 94 S.Ct. at 1692.

9. 361 F.2d 581 (3d Cir. 1966), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967) (County prosecutor, not operating clearly outside of his jurisdiction, is immune).

10. Johnson v. Alldredge, 488 F.2d 820, at 826 (3d Cir. 1973).

common law," in the sense of a more or less unitary set of rules, is a chimerical notion. We need not, however, enter the the philosophical fray generated by this assertion to acknowledge that the courts of some jurisdictions extend immunity to government officers in some situations whereas courts of other jurisdictions would decline to recognize immunity.[11] As a result, federal courts may, on occasion, be faced with a conflict between a common law rule applied by state courts in suits against state officials and a common law rule applied by federal courts largely in suits against federal officials.[12]

It may be contended that the Supreme Court in *Pierson* directed the federal courts to permit defendants in section 1983 suits to assert only those defenses and immunities recognized by state courts. The Supreme Court pointed out that the Court of Appeals for the Fifth Circuit had previously concluded that "under the common law of Mississippi" police officers could not be held liable for false arrest if they acted in good faith and with probable cause.[13] The Court of Appeals had held, however, that *Monroe v. Pape*[14] precluded the assertion of the good faith defense in a section 1983 suit.[15] The Supreme Court reversed on the latter point, thereby permitting the state officers to raise the defenses available "under the common law of Mississippi."

We do not regard the language of the Supreme Court in *Pierson* relating to the good faith defense as requiring that we canvass Pennsylvania law to determine which defenses and immunities are available to Rundle in this case.

First, when considering the immunity question, the Supreme Court in *Tenney* and in *Pierson* seemed to rely primarily on the "prevailing view in this country."[16] It referred in general terms to the veneration owed to the judicial and legislative immunities because of their roots in the English common law prior to the founding of the United States and their quick and nearly uniform adoption by the several states after independence.[17] Thus, at least with respect to the judicial and legislative immunities, the Supreme Court seemed to apply principles that transcended state boundaries.[18]

Second, a plaintiff in a section 1983 suit is asserting a federal cause of action for alleged infringement of federal constitutional rights. To assure that

11. *See, e.g.,* Prosser, Law of Torts 988 (4th ed. 1971) (pointing out that the federal courts have extended to officials other than judicial officials the absolute immunity traditionally granted at common law to such officials, while state courts have been more reluctant to widen the scope of absolute immunity).

12. In Daye v. Commonwealth, 344 F.Supp. 1337 (E.D.Pa.1972), the district court, purporting to follow Erie R. R. v. Tomkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), applied the Pennsylvania law of official immunity in a suit based on federal question jurisdiction. The court pointed out that under Yealy v. Fink, 43 Pa. 212 (1962), a state official is "immune from tort liability so long as [his] act was not malicious or so wanton and reckless as to prove it was malicious." 344 F.Supp. at 1349. Although many of the cases in which *Yealy* has since been applied appear to involve discretionary actions of state officials, Pennsylvania courts do not seem to have developed the distinction between "discretionary" and "ministerial" functions contained in Barr v.

Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L. Ed.2d 1434 (1959). *See* p. 800, *infra.* This case, therefore, may well present a situation where "the federal common law" and "the state common law" would lead to different results.

13. 386 U.S. at 555.

14. 365 U.S. 167 (1961).

15. 386 U.S. at 557.

16. 386 U.S. at 555; *see* Scheuer v. Rhodes, 42 L.W. 4543 (April 17, 1974).

17. "The privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries.

"Freedom of speech and action in the legislature was taken as a matter of course by those who severed the colonies from the Crown and founded our Nation." 341 U.S. at 372.

18. *But cf. id.* at 376.

a plaintiff's recovery does not depend upon the locale of the events resulting in the claimed injury or the state citizenship of the perpetrator, a single set of rules relating to the defenses and immunities available to the defendant state official in a section 1983 suit seems appropriate.[19] Thus, we conclude that federal courts may be guided, but are not bound, by the vagaries of state law with respect to the immunities and defense available in section 1983 suits.

## III. COMMON LAW PROTECTIONS AVAILABLE TO SUBORDINATE STATE OFFICIALS IN SECTION 1983 SUITS.

### A. Immunities

Returning to the exact situation presented by this case, Rundle is, of course, neither a judicial officer nor a legislator so his situation is not specifically controlled by Tenney or Pierson. Since, as already concluded, we need not automatically look to Pennsylvania law to determine the defenses and immunities that Rundle may assert, we must, if we are to follow the Supreme Court's lead in Tenney and Pierson, fall back upon general principles of the common law. Conceivably, the application of general principles in section 1983 actions should be tempered by an appreciation of the policies supporting section 1983. It appears, however, that the Supreme Court did not conclude in Tenney and Pierson that section 1983 required modification of time-honored rules.[20]

▮ Fortunately, the Supreme Court in cases involving federal officials has provided guidance in the area of common law immunities generally available to subordinate executive officials. In Barr v. Matteo,[21] there was a suit by former employees of the Office of Housing Expediter against the Acting Director of the Office of Rent Stabilization for defamatory and malicious public statements. Justice Harlan, enunciating principles approved by a majority of the Court,[22] stated that the Acting Director's action was "an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively" and was "within the outer perimeter of [the Acting Director's] line of duty." Therefore, he concluded that the Acting Director enjoyed immunity from a damage suit, "despite the allegations of malice." [23] If, on the other hand, the subordinate executive official's duties are "ministerial" rather than "discretionary," the federal courts have followed the prevailing common law rule and refused to clothe the official with immunity for wrongful acts.[24] Although the language of the Supreme Court in Scheuer may be read to cast some doubt on the viability the ministerial-discretionary distinction, the Court seems to have adopted this general approach to immunity in section 1983 suits.[25]

### B. Defenses

▮ Although an official performing "ministerial" functions does not enjoy immunity from suit, it is hopefully not his destiny to be rendered impecunious by damage suits for inadvertent errors in the conscientious pursuit of his du-

19. Cf. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

20. See pp. 797–798, supra.

21. 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

22. See 360 U.S. at 592 (Stewart, J., dissenting) ["My brother Harlan's opinion contains, it seems to me, a lucid and persuasive analysis of the principles that should guide decision in this troublesome area of the law."]. Justice Harlan was writing for a plurality of the Court.

23. 360 U.S. at 575. See Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949) (L. Hand, J.), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

24. In Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narc., 456 F.2d 1339 (2d Cir. 1972), the court held that although the officials were acting within the outer perimeter of their line of duty, they were not entitled to immunity because they were not "engaged in the performance of the sort of 'discretionary' acts that require the protection of immunity." Id. at 1343. See Prosser, Law of Torts, 989–90 (4th ed. 1971).

25. See p. 798, supra.

ties. In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,[26] the Second Circuit held that the defense of good faith and probable cause was available to the federal law enforcement officers, otherwise not immune, in a damage suit for violation of Bivens' Fourth Amendment rights.[27] Recently, in Johnson v. Alldredge,[28] this Court utilized the principles of *Barr* and alluded to the availability of the good faith defense [29] in a suit against federal prison officials performing "ministerial" duties.[30]

## IV. THE TREATMENT OF COMMON LAW IMMUNITIES AND DEFENSES IN THE CASE AT HAND.

Although *Barr, Bivens,* and *Johnson* are cases involving federal officers, there would seem to be no reason for declining to extend the principles of immunities and defenses formulated in those cases to section 1983 suits against state officers.[31] Indeed, the Supreme Court in *Scheuer* recently recognized *common law immunities and defenses in section 1983 suits against state officials.*

This Court, in Safeguard Mutual Insurance Company v. Miller,[32] applied the principles of both immunity and the good faith defense to a civil rights action against officials of the Pennsylvania Insurance Department. With respect to the good faith defense, Judge Gibbons, citing *Bivens,* indicated that the officials had the burden of pleading and proving that they had a reasonable good faith belief that their actions were lawful.[33]

Though the district court, in the case *sub judice,* was correct in noting that Rundle, had he been performing a ministerial function, might well avail himself of the good faith defense, its order dismissing the complaint on the record before it was premature. In *Safeguard* the Court, presaging the Supreme Court's decision in *Scheuer,* indicated the information that a district court should have before it when ruling on a defendant's assertion of the good faith defense. Even if we assume that the district court treated Rundle's pretrial motion as one for summary judgment and, therefore, considered the affidavits, admissions, and answers to interrogatories present in the record, these materials do not add to the facts alleged in the complaint any matter relating to the good faith defense of Rundle. "And since," as Judge Gibbons stated in *Safeguard,* "good faith is a matter of defense, the determination of that issue as to [Rundle] must await proceedings beyond a Rule 12(b)(6) motion." [34]

The district court, presumably without intending to indicate its position as to the constitutional validity of the Pennsylvania statute, arguably requiring Rundle to assign Fidtler to work, stated that the "[d]efendant had every reason to believe that [the statute] was and is valid and it commanded him to do precisely what he did." However, the district court did not, nor could it, without further proceedings calculated to develop the relevant facts, make any finding that Rundle did, in fact, rely in good faith on this statute. The Supreme

---

26. 456 F.2d 1339 (2d Cir. 1972).

27. *Id.* at 1347.

28. 488 F.2d 820 (3d Cir., December 12, 1973).

29. *Id.* at 799.

30. In *Johnson,* the district court, on the basis of affidavits specifically relating to the duties of the officers sued, denied their motions for summary judgment grounded upon immunity. The question of immunity was certified by the district court to this Court pursuant to 28 U.S.C. § 1292(b). Relying

also on the affidavits, this Court reversed with respect to the warden of the federal prison and affirmed and remanded with respect to the prison guard.

31. Although unnecessary to its holding, the court in *Bivens,* citing *Pierson,* made the following statement: "We believe this to be the same defense held applicable to cases arising under Section 1983." *Id.*

32. 472 F.2d 732 (3d Cir. 1973).

33. *Id.* at 734.

34. *Id.*

Court's language in *Scheuer* is particularly apt:

> In dismissing the complaints, the District Court and the Court of Appeals erroneously accepted as a fact the good faith of the Governor. . . . There was no evidence before the Court from which such a finding of good faith could be properly made.
>
> . . .

In *Scheuer*, the record before the district court contained merely the complaints and two proclamations of the Governor, only one of which related to the conditions of Kent State. In the case at hand, the dearth of material before the district court concerning the good faith of Rundle is similar to the sparse record present in *Scheuer*.

■ Viewing good faith as a defense creates some difficulty in this case in light of the wise tenet that constitutional questions are to be avoided when disposition on nonconstitutional grounds is proper.[35] This is so since the defense of good faith need become an issue only after the plaintiff has established a violation of civil rights. In this case, for example, the facts on which Fidtler bases his constitutional claims do not appear to be contested. Thus, the district court might well decide the legal question—i. e., whether those facts amount to a constitutional violation—without an evidentiary hearing on the good faith defense.

If Rundle asserts the good faith defense, however, and Fidtler responds by alleging lack of good faith, evidentiary proceedings may be necessary to resolve satisfactorily the disputed factual issues. In such situation, judicial resources may be conserved by the district court's deciding the constitutional question. This is so because if Fidtler's constitutional claims are rejected, the need for an evidentiary proceeding with respect to the good faith defense would be obviated.

Nonetheless, in light of the salutary precept that constitutional questions are to be avoided when appropriate to do so, and especially when a state statute is at issue that has not been interpreted in a similar context by the state court, we cannot say that a district judge would, in all instances, act improperly if he should determine whether the state officer was acting in good faith before actually dealing with the constitutional issues.

The district court may not, however, be faced with the dilemma just posed, for the district court in this case apparently did not consider whether Rundle's activities were "discretionary" and, thus, within the absolute immunity provided by *Barr*.[36] It would seem to be appropriate for the district court to address the question of Rundle's immunity before examining Fidtler's constitutional claims. The district court must, nonetheless, keep in mind the admonition of *Lasher v. Shafer* [37] relating to the information that it should have before it prior to ruling on a claim of immunity, such as Rundle will surely assert here: "a decision that each of the appellees is entitled to some form of executive immunity is one that cannot be made on the basis of the allegations in the complaint." [38] In *Lasher*, as in *Safeguard*, this Court reversed district court holdings that the defendants in section 1983 suits were entitled to immunities and defenses because the records in those cases, as here, were inadequate to warrant such holdings.

Accordingly, the judgment of the district court will be reversed and the case remanded for proceedings consistent with this opinion.

---

35. *See* Ashwander v. TVA, 297 U.S. 288, 346, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

36. Of course should the district court consider that the facts alleged by plaintiff would, if taken as true, not amount to a constitutional violation, the district court could properly dismiss on a motion under Rule 12(b)(6)

and need not consider questions concerning immunities nad defenses. *See, e.g.,* Gittlemacker v. Prasse, 428 F.2d 1 (3d Cir. 1970). *But cf.* Scheuer v. Rhodes, —— U.S. ——, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

37. 460 F.2d 343 (3d Cir. 1972).

38. *Id.* at 348.