UNITED STATES of America ex rel.
Edward LEWIS

v.

Robert L. JOHNSON.

Civ. A. No. 73–132.

United States District Court,
E. D. Pennsylvania.

Sept. 28, 1974.

Howard Lesnick, Ralph S. Spritzer, Thomas Donovan, University of Pa., Indigent Prisoners Program, Philadelphia, Pa., for plaintiff.

Michael Minkin, Herman Rosenberger, Asst. Attys. Gen., Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

### FINDINGS OF FACT

1. At all times relevant to this lawsuit the plaintiff, Edward Lewis, was lawfully incarcerated at the State Correction Institute at Graterford (hereinafter "Graterford").

2. At all times relevant to this lawsuit the defendant, Robert L. Johnson, was superintendent at Graterford.

3. On the evening of November 2, 1972, during the evening recreational period, plaintiff became involved in an altercation with another inmate, Harold Reaves. Also involved in this altercation was another inmate, Carl Green. Lewis became involved when he attempted to ward off Reaves, who had without warning attacked Carl Green with a knife.

4. During this altercation Harold Reaves stabbed Edward Lewis in the back.

5. Immediately after this attack plaintiff was sent to the prison hospital. Plaintiff was diagnosed in the prison hospital as having a stab wound in the right side of his upper back, a pneumothorax (collapse of the lung due to the presence of air in the space between the lung and the inner surface of the chest wall) and a hemothorax (an accumulation of blood between the lung and the inner surface of the chest wall) of the right lung.

6. Plaintiff's physical condition was treated by cleaning and bandaging his stab wound and surgically inserting a tube into his right chest.

7. Plaintiff remained in the prison hospital from November 2, 1972 until approximately 11:30 a. m. on November 6, 1972.

8. On the morning of November 6, 1972, the tube was removed from plaintiff's chest and he was released from the prison hospital.

9. The misconduct report written by a guard at the scene of the altercation noted that plaintiff "was seen assulting . . . Harold Reaves upon the head with a squeegee handle" and charged plaintiff with assault with a deadly weapon.

10. The officer in charge of the prison block decided to place all three of the fight's participants in isolation. This decision was in keeping with the

prison's policy of isolating both the perpetrators and the victims of a fight in order to prevent retaliation against either the perpetrator or victim of an attack by a member of the prison's general population.

11. Consequently, inmates Reaves and Green were placed in solitary confinement on the night of November 2, 1972, Reaves in the Behavior Adjustment Unit and Green in the B-Block Gallery. Plaintiff was placed in solitary confinement in Cell No. 400, B-Block Gallery, upon his release from the hospital on November 6, 1972.

12. From the evening of November 2, 1972, the Pennsylvania State Police were called to the Institution and undertook an investigation into the altercation between Harold Reaves, Edward Lewis, and Carl Green.

13. Sometime after plaintiff came into B-Block on the evening of November 6, plaintiff noticed that the wound left in this chest by the removal of the tube had begun to bleed. As a result of this bleeding, plaintiff was allowed by the guards to report back to the prison hospital.

14. Plaintiff remained in the prison hospital until the morning of November 8, 1972, at which time he was released from the hospital and returned to a segregated status in B-Block Gallery, Cell No. 400.

15. The cells in B-Block Gallery are identical to the cells occupied by inmates in the general population. Each B-Block Gallery cell has a sink with running water, a toilet, and a metal cot and mattress. Each B-Block cell has a window opposite the door which can be opened and closed by the inmate. However, the window of Cell 400 at the time of plaintiff's confinement was cracked, and a pane of the window was missing, with only a cloth to block the cold.

16. Plaintiff was placed in segregation on November 6, 1972, and again on November 8, 1972, dressed only in cotton coveralls and shoes. He was without underwear, socks, sweater, coat or other clothing.

17. On or about November 11, 1972, plaintiff was able to secure additional clothing only by borrowing some from another inmate. Plaintiff borrowed from another inmate two sweatshirts and some underwear. Repeated requests for the transfer of his personal clothing from his normal cell to his cell in B-Block Gallery were ignored.

18. As a result of the cell's broken window and the prison's failure to provide plaintiff with adequate clothing plaintiff suffered considerably from the cold. This was true even though outside temperatures did not drop below 38° F.

19. On or about November 11, 1972 plaintiff was removed to Cell No. 388 on B-Block. By this time, plaintiff had been given winter clothing by another inmate. The window of Cell 388 was intact and the temperature within the cell was consequently warmer than those that had prevailed in Cell No. 400.

20. On or about November 14, 1972 plaintiff was removed to Cell No. 380 on B-Block. Cell 380 was likewise not as cold as Cell 400 had been.

21. On or about November 16, 1972, Harold Reaves was transferred from Graterford to another prison.

22. On December 1, 1972 plaintiff received a hearing before members of the prison staff on a charge of assaulting Harold Reaves. Plaintiff was found guilty by the staff. The staff's report stated that all three inmates involved in the November 2 fight "had been held for State Police investigation".

23. On December 1, 1972 plaintiff was released to the General Population.

24. Plaintiff received no punishment after the December 1, 1972 hearing.

25. The prison officials classified plaintiff's isolation as "Administrative Segregation". Under the prison regulations a prisoner in Administrative Segregation status is entitled to eat with the general population and have daily exercise and showers. However, between

November 6 and December 1, 1972, plaintiff was required to eat all his meals in his cell, was allowed no exercise, and was permitted only three showers.

26. At all times relevant to this lawsuit, B-Block housed both those prisoners confined to Administrative Segregation and those confined to Punitive Segregation. It was testified to at trial that the principal difference between Punitive and Administrative Segregation was that prisoners in Punitive Segregation were denied radios. Plaintiff was allowed to have a radio in his cell.

27. Although Superintendent Johnson did not order plaintiff to be placed in segregation originally, he was informed of plaintiff's status soon after November 2, 1972 and ordered plaintiff to be continued in isolation.

28. Defendant Johnson's acts were not discretionary. Defendant merely was following a policy which he himself had previously instituted. The decision to institute such a policy was, of course, an exercise of defendant's discretion, but the plaintiff here has not sued defendant for instituting the policy but for applying it to him without a hearing.

29. Defendant Johnson's decision to continue plaintiff in isolation was based on the institution's policy of separating the aggressors and victims of an attack from the general prison population. This policy was adopted in order to protect aggressors and their victims, as well as other inmates, from retribution. At the time he ordered plaintiff continued in solitary confinement, defendant Johnson was acting in good faith and with a reasonable belief that the policy of segregating the incident's victims without a hearing was constitutional.

30. Defendant was aware of the requirement that a prisoner receive a hearing before being placed in solitary confinement, but he both reasonably and in good faith believed that the situation presented by an altercation among inmates suspended the need for such hearing, at least until the state police investigation into the altercation was completed or any danger which might be created by placing those involved in the fight among the general population had dissipated.

31. Defendant Johnson had inspected B-Block Gallery in the spring of 1972 and was familiar with the general conditions prevailing there. However, there is no evidence that defendant Johnson was familiar with specific conditions in each individual cell on B-Block.

## CONCLUSIONS OF LAW

1. The placing of plaintiff in solitary confinement following his release from the prison hospital on November 6, 1972 (and following his readmission and release on November 8, 1972) without a hearing to determine whether he was the victim of an attack violated the rights guaranteed to plaintiff under the Fifth and Fourteenth Amendments to the United States Constitution.

2. The conditions of plaintiff's confinement did not constitute cruel and unusual punishment by defendant Johnson in that Johnson was unaware of the specific defects in Cell No. 400 which permitted the temperature in that cell to drop below acceptable levels.

3. No other condition of plaintiff's confinement constituted cruel and unusual punishment by defendant Johnson.

4. Defendant Johnson is not personally responsible for any negligent acts of other employees of the prison.

5. In keeping plaintiff in solitary confinement without holding a hearing defendant Johnson was following in good faith an institution policy which he reasonably believed at the time to be constitutional. Therefore, defendant Johnson is immune from suit for damages under 42 U.S.C. § 1983.

6. In segregating plaintiff Lewis, defendant Johnson was acting pursuant to a clear and specific policy. Therefore, his actions were ministerial rather than discretionary, but since he acted in

the good faith belief that this policy was constitutional, he is immune from suit for damages under 42 U.S.C. § 1983.

## MEMORANDUM

### I. DUE PROCESS

█ It is the rule in this Circuit that, absent unusual circumstances, a prisoner must receive a hearing before he can be placed in solitary confinement. Gray v. Creamer, 465 F.2d 179 (3rd Cir. 1972). Although the *Gray* case condemned segregating a prisoner without a hearing for either punitive or "administrative" reasons, 465 F.2d at 184, the situation presented to the *Gray* Court was a reprisal by prison authorities against certain prisoners who had published a newspaper critical of prison administrators. The plaintiffs in *Gray* were, among other disciplinary measures, placed in punitive and administrative segregation without being charged with violating prison regulations or without having a hearing to determine the validity of any charges.

The courts have been reluctant to expand the *Gray* rule to cover those situations where a prisoner is being segregated not because he violated the rules but because his well-being or even life may be endangered by remaining in the prison population. Watkins v. Johnson, 375 F.Supp. 1005 (D.C.1974) (Higginbotham, J.). In *Watkins*, plaintiff was involved in a violent prison disturbance at Graterford prison. Following an investigation of the incident by the Pennsylvania State Police, plaintiff and seventeen other inmates were arrested and arraigned on criminal charges. Following the arraignment plaintiff was segregated from the general population "pursuant to an institution policy which requires that the perpetrators of an attack on other inmates are segregated for the safety of the victims of the original attack, as well as the safety of the perpetrators who might be the targets of retaliation by the victims of the original attack." *Watkins*, at p. 1006. This policy became effective upon the identification of the perpetrators of an attack; the identification in *Watkins* was made by the State Police almost two months after the fracas.

The District Court found the policy of separating an attacker from his victims to be constitutional and entered summary judgment in favor of the superintendent on the grounds that plaintiff's arraignment had constituted a hearing, giving ample rational basis for the superintendent's determination that plaintiff perpetrated the attack. As for plaintiff's contention that he was entitled to a hearing on the issue of whether it was necessary for protective purposes to separate plaintiff from his alleged victims, the Court found that no such hearing was required by *Gray*. That case, the Court declared, only compelled a hearing to determine "whether a factual nexus was established that as to plaintiff there were actual victims of his alleged attack." *Watkins*, at p. 1009.

█ The policy followed by Superintendent in the case before this Court expands upon the policy followed in *Watkins*, but both are based upon the same apprehensions that allowing a fight's participant to remain among the general population creates a risk of further violence. We do not feel that it would be wise or proper for a court to second guess the wisdom of these policies. But we do believe that it would constitute a deprivation of a prisoner's Fourteenth Amendment rights if he could be put in solitary confinement without any hearing merely because prison officials believe that he was the victim of an attack. Before the institution's policy of segregating attackers and victims from the general population can be followed with respect to a purported victim, a hearing must be held to determine whether he was in fact the victim of an attack.[1] For this

---

1. Of course, the requirement of such a hearing may seem superfluous in this case since plaintiff was hospitalized for knife wounds. But less obvious circumstances are easily imaginable.

Court to hold otherwise would be to create a standard under which an alleged aggressor would be entitled to a hearing before he could be placed in segregated status but an alleged victim could be placed in unlimited solitary confinement without any hearing at all.

Of course such a hearing need not be held immediately following an altercation, assuming that such an altercation rises to the level of "unusual circumstances". Biagiarelli v. Sielaff, 483 F.2d 508 (3rd Cir. 1973); Gray v. Creamer, 465 F.2d 179 (3rd Cir. 1972). But where there has been sufficient time to gather information as to the identity of attackers and victims, then it is a violation of due process to continue that prisoner in isolation without a hearing establishing a rational basis for the belief that he was either an attacker or a victim of a violent outbreak.

In the present case plaintiff pled guilty to assault with a deadly weapon during the altercation. But this plea came a month after the altercation, a month during which plaintiff was segregated and denied any hearing on the matter. Had a hearing been held promptly to determine who was an aggressor and who a victim, and had plaintiff pled similarly at that time, his continued segregation would not have contravened due process.

 Defendant invokes the State Police investigation which followed the November 2, 1972 incident as an excuse for delaying the hearing into whether plaintiff attacked his fellow inmates. The pendency of a State Police investigation should not, under normal circumstances, prevent an early hearing. The purpose of such a hearing is to establish probable cause, not to convict.

It seems unfair that a prisoner should be placed in solitary confinement merely because he was the victim of an attack. But for this Court to say that the policy the Superintendent followed was ill-founded, or to burden the implementation of this policy by requiring a hearing into the dangers of releasing a prisoner back to the general population, would be to upset the balance which the Gray Court declared must be struck between protecting an inmate's constitutional rights and not interfering with the practical necessities of administrating a prison. The task of identifying those situations which may give rise to violence is more competently performed by prison officials than by judges.

## II. IMMUNITY

 It is our opinion that the proper test of immunity for an official such as defendant is whether reasonable grounds existed at the time of his allegedly unconstitutional acts for believing that those acts were constitutional and whether he held such a belief in good faith. Scheuer v. Rhodes, 416 U.S. 232, 247, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The scope of an official's discretion is a factor to be taken into consideration in determining reasonability and good faith. Where, as here, it has been factually established that there were reasonable grounds for believing his actions constitutional and that his belief was in good faith, the official is immune from suit under 42 U.S.C. § 1983. Scheuer v. Rhodes, supra, at 247, 94 S.Ct. 1683.

The Third Circuit has postulated what seems to be a different standard for determining an official's immunity than the one established in Scheuer. Fidtler v. Rundle, 497 F.2d 794 (1974). In Fidtler the Court drew a distinction between officials exercising discretionary and those exercising ministerial functions. Once it has been factually determined by the District Court that a defendant official was acting within his discretion when he committed the allegedly unconstitutional acts, the immunity of that official is complete. 497 F.2d at 800. Even if an official was merely following a clear directive when he acted, however, he would be immune from § 1983 liability for his acts if he acted in the good faith belief that they were constitutional.

The result in this case is the same whether the *Scheuer* test or the *Fidtler* test is employed. In segregating plaintiff Superintendent Johnson was acting pursuant to clear and specific policy, even if it was one which he had himself established. At trial Johnson declared that the policy required Lewis' segregation and that he would have treated any other prisoner in the same situation similarly. Our finding of good faith belief, however, immunizes Johnson in the performance of what was in effect, a ministerial act.