**David TYRRELL, Plaintiff,**

**v.**

**Kenneth TAYLOR et al., Defendants.**

**Civ. A. No. 71–939.**

United States District Court,
E. D. Pennsylvania.

Feb. 21, 1975.

Lewis Lieberman, Philadelphia, Pa., for plaintiff.

Michael Minkin, Asst. Atty. Gen., Philadelphia, Pa., for defendants.

## OPINION AND ORDER

HUYETT, District Judge.

This action is before us on remand from the Court of Appeals for the Third Circuit.[1] Invoking 28 U.S.C. §§ 1331 and 1343(3) and 42 U.S.C. § 1983, plaintiff David Tyrrell seeks damages for deprivation of civil rights by state officials resulting from his 1970 transfer from Delaware County Prison to Graterford State Prison and from the conditions under which he was incarcerated for the first eight or nine months of his confinement at Graterford.

## I. HISTORY OF THE CASE

■ ■ Plaintiff's pro se complaint, not unusually, contained a series of imprecise claims and allegations of miscon-duct by state and prison officials. He has had two different Court-appointed student counsel during the pendency of this litigation, and his claims under this complaint have, with time, undergone something of a metamorphosis. Naming fifteen defendants, plaintiff's 1971 complaint alleged a conspiracy among all the defendants to deprive him of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. One infers from the complaint that plaintiff also claims against the defendants for their individual activities outside the context of the alleged conspiracy. A careful review of the complaint, however, reveals no allegations of misconduct cognizable under the Fourth, Fifth, or Sixth Amendments.[2] Moreover, defendants, like claims, have dwindled during the course of litigation. Defendants Speaker, Creamer, Prasse, and Sielaff were dismissed by the Appeals Court in January 1973.[3] Counsel for the parties stipulated to the dismissal of defendant Johnson.[4] By our Order of March 4, 1974, we dismissed institutional defendants Bureau of Corrections and Delaware County Prison under the theory of Moor v. County of Alameda.[5] Finally, although plaintiff originally sought both damages and injunctive relief, only his

---

1. The Third Circuit opinion is at 471 F.2d 1197 (3d Cir. 1973). Upon a review of the record, the Court treated the motion to dismiss on which we had disposed of the case as a motion for summary judgment. The Court then found there existed disputes over material facts and that disposing of the action on a motion for summary judgment was inappropriate. The Court therefore remanded to us for trial.

2. The Third Circuit apparently agrees with us on this point since it remanded so that we could determine at trial "whether or not Tyrrell's rights under the First, Eighth, and Fourteenth Amendments have been violated." 471 F.2d at 1204.

3. *Id.*

4. Plaintiff was dissatisfied with this stipulation and some others made at the same time. His dissatisfaction prompted him to petition us for new counsel, a request we granted.

Although new counsel did voice concern about one of the other stipulations relating to the reason for plaintiff's placement at Graterford State Prison, he did not raise the question again of defendant Johnson's dismissal. We believe rightly so. Defendant Johnson became superintendent of Graterford after plaintiff had been released from the conditions of confinement which he challenges here and could not, therefore, be liable to plaintiff.

5. 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). In one of his later briefs (Document #29 in the file), plaintiff asserts that these institutions were included in the caption as addresses not as defendants. We assume from the form of the caption that this is true also of the Pennsylvania Department of Justice and Graterford State Prison. In any case, to clear the record, we dismiss these institutions as well.

damage claim remains viable. Plaintiff has long since been released from the particular conditions of confinement at Graterford of which he complains, and his counsel informs us that he is presently at Dallas State Prison. Thus, any claim for injunctive relief based on the alleged illegality of either his specific or general [6] confinement at Graterford is moot.

We proceeded to trial, then, on the question of whether or not the remaining defendants, either individually or in concert, are liable to plaintiff in damages for depriving him of his constitutional rights under the First, Eighth, or Fourteenth Amendments. Plaintiff's case consisted of two sets of stipulated facts (plaintiff's exhibits 1 and 2), a part of the answer to the complaint of defendant Rundle, read into the record, and the testimony of plaintiff Tyrrell and Frank J. Crutchley and Daniel Harvey, both of whom had been confined in Graterford in the same section of the prison and under the same conditions as plaintiff. The Commonwealth defendants' case consisted of nine copies of various state records relative to plaintiff's arrest on the charge of attempted escape and to his confinement at Grater-

ford. The defense put on no witnesses and offered no depositions.

## II. FINDINGS OF FACT

We have spent the rather considerable time that has elapsed between the Third Circuit's remand of this action and this opinion attempting to compile a factual record upon which we would be satisfied to base a decision. The task has not been easy.[7] Neither the facts nor the issues are yet as sharply focused as we would wish, but we are satisfied that we have a complete enough record to dispose finally of this action.

Based on this record,[8] then, we find the following facts.

1. Plaintiff was arrested on December 20, 1969, and charged with a series of crimes including robbery and the shooting of a police officer.

2. On January 22, 1970, while he was lawfully incarcerated in Delaware County Prison unable to furnish bail and awaiting trial on these charges, defendants William E. Rambo and Samuel LaSpina, guards at the prison, saw plaintiff leaving a cell assigned to another inmate. When they asked plaintiff what he was doing in the cell, he told them he went

---

6. *See* section of opinion entitled *Claim Against Defendant Zigler.*

7. For example, we felt compelled to order a post-trial affidavit from the present superintendent of Graterford prison in an attempt to ascertain past and present prison policy relevant to this action. From this process we found, and plaintiff in his counter-affidavit does not dispute this, that the policy, challenged by plaintiff, of holding pretrial detainees under more restricted conditions than the general prison population is no longer in effect at Graterford. Pretrial detainees are now placed in the general population. This information simplifies matters and allows us to shape any relief we deem appropriate. The Commonwealth defendants objected generally to our requiring the post-trial affidavit on the ground that the information sought was irrelevant and that the court order forced "the defendants to put on evidence which counsel deemed inappropriate at time of trial." In our attempt to maintain the delicate balance between the

rights of prisoners and the admitted need to have prison authorities rather than courts running prisons, we find defendants' objections outweighed by the advantages of a clearer and more complete record. *See, e.g.,* Finney v. Arkansas Board of Correction, 505 F.2d 194 (8th Cir. 1974), in which the Court of Appeals for the Eighth Circuit ordered the district court to continue to direct the reform of the Arkansas prison system and advised the lower court to call its own witnesses if necessary. Plaintiff also objected to our requiring the post-trial affidavits, apparently from a fear that we would use the information contained therein to resolve factual disputes. This we neither intended nor did.

8. We rely for our findings on the stipulations of fact contained in plaintiff's exhibits 1 and 2, admitted in evidence, the state and prison records represented by defendants' exhibits 1 through 9, admitted in evidence, and the stipulations and testimony contained in the trial record.

in to get a cigarette. Defendant guards then checked the cell and, behind a poster, found a hole in the wall. They reported this incident to defendant John Gable, then Warden of Delaware County Prison.

3. On January 28, 1970, Warden Gable filed a criminal complaint (defendants' exhibit 1) against plaintiff charging him with attempting to break prison and escape.

4. On January 29th a preliminary arraignment was held (defendants' exhibit 3) and on February 3, 1970, plaintiff and his counsel were present at a preliminary hearing before Justice of the Peace Clarence B. Nesbitt, Jr., at which defendants Gable, Rambo, and LaSpina testified. (defendants' exhibit 3). Unfortunately, we appear to have only part of the record of this preliminary hearing since the page we have ends in mid-sentence with the notation "(ove". The Commonwealth is unable to provide us with a complete copy. The result of these proceedings was a finding that probable cause existed to hold plaintiff for trial on the charge of attempted escape.

5. On February 4, 1970, defendant Gable initiated a petition pursuant to 61 P.S. § 72 [9] to transfer plaintiff to Graterford as a security risk. Pursuant to 61 P.S. § 72 defendant Kenneth E. Taylor, Deputy Commissioner for the Bureau of Corrections, and the late Judge Sweeney, President Judge of the Delaware County Court of Common Pleas, approved the petition.

6. On February 10, 1970, plaintiff was transferred to Graterford as ordered and, after an interview with the Behavior Clinic on February 13, 1970, was placed in that section of the prison designated "B Block Gallery, Administrative Segregation." [10] At the Behavior Clinic interview prison officials told plaintiff he had been transferred from Delaware County Prison as a security risk and permitted plaintiff to give his version of the events at Delaware County Prison.

7. From February 13, 1970, to October 21, 1970, with some interruptions during which plaintiff was transferred back to Delaware County Prison for court proceedings,[11] plaintiff was confined in "B Block Gallery, Administrative Segregation."

8. On or about October 9, 1970, plaintiff was convicted in Delaware County of the original charges of rob-

9. 61 P.S. § 72 reads in part:

The Deputy Commissioner for Treatment of the Bureau of Correction in the Department of Justice, is hereby authorized and empowered and, upon petition being presented to him by the board of inspectors, if there be such board, otherwise the superintendent or official in charge of any penitentiary, prison, workhouse, house of correction, or other institution for adult prisoners, located within any county, or by the county commissioners of the county in which the institution is located, setting forth that the said penitentiary, prison, workhouse, house of correction, or other institution for adult prisoners, cannot, by reason of overcrowded condition or other existing conditions, furnish proper and sufficient accommodations for the care, custody, control, and safety of the inmates thereof, and that it is requested that a certain number of inmates, set forth in such petition, should be transferred therefrom, may make an order authorizing and directing the said board of inspectors, if there be such board, otherwise the superintendent

or official in charge, to transfer to another prison, penitentiary, workhouse, house of correction, or other institution for adult prisoners, such person or persons whom the board of inspectors, if there be such board, otherwise the superintendent or official in charge, shall specify and designate: Provided, however, That before any transfer is made as aforesaid the court of common pleas of the county wherein any such penitentiary, prison, workhouse, house of correction, or any other institution for adult prisoners is located, shall give its consent to such transfer.

10. The Behavior Clinic interviewed plaintiff on August 8 and September 10, 1970, also. Plaintiff returned to B–Gallery after both of these interviews, and they have no real significance in this litigation.

11. Plaintiff was confined at Delaware County Prison, while attending court proceedings, from March 17 to May 6, 1970, from June 17 to June 23, 1970, and from October 5 to October 19, 1970.

bery and the shooting of a policeman. On his return to Graterford he was immediately interviewed by the Behavior Clinic on October 20, 1970, and the next day placed in C–Block in the general prison population because he was now a convicted but unsentenced prisoner. (defendants' exhibit 5).

9. On February 9, 1971, plaintiff was acquitted of the charge of attempted escape. As with the missing part of the record of plaintiff's preliminary hearing on February 3, 1970, the Commonwealth has been unable to produce a copy of the record from the trial for attempted escape.

■ 10. Plaintiff was placed in "B–Block Gallery, Administrative Segregation" because he was a pretrial detainee or untried prisoner and not because he was determined to be a security risk at Graterford. This finding of fact is the crucial one in this action and the one most hotly disputed. The Commonwealth defendants contend that plaintiff was placed in administrative segregation because he was a security risk at Graterford. They offer as evidence a stipulation entered into by plaintiff's first student counsel that "[p]laintiff . . . was told [at the Behavior Clinic's interview of February 13, 1970] that he had been placed in administrative segregation because of his status as an alleged security risk" (plaintiff's exhibit 1, #12). Plaintiff contends that he was placed in administrative segregation because he was a pretrial detainee. He offers as evidence the following portion of the answer to the complaint filed by defendant Alfred T. Rundle, Superintendent of Graterford in 1970:

> The defendants deny that the plaintiff was placed in punitive segregation upon his receipt at the State Correctional Institution at Graterford. On the contrary, the defendants aver that the plaintiff was placed in administrative segregation because of his status as an untried and unconvicted prisoner.

This portion of defendant's answer was read into the record at trial and admitted without objection. Plaintiff also relies on the following stipulations of fact admitted into the record at trial:

> As of February 10, 1970, the policy of Superintendent Rundle of the State Correctional Institution at Graterford was to place pretrial detainees in administrative segregation. (Plaintiff's exhibit 2, #1)
>
> \*  \*  \*  \*  \*  \*
>
> Superintendent Rundle had personal knowledge of, and approved of, plaintiff's confinement in administrative segregation. (Plaintiff's exhibit 2, #4)

Plaintiff further offers as evidence the testimony of his three trial witnesses that they understood that they were placed in administrative segregation because of their status as pretrial detainees. Finally, plaintiff points out that he was immediately placed in the general prison population on his return from Delaware County after his robbery conviction. On the basis of this evidence, we find that plaintiff has carried his evidentiary burden, and we resolve this factual dispute in his favor.[12]

---

12. Although we cannot expect pro se pleadings by prisoners to be models of clarity, we are disturbed by the inconsistent pleading by the Commonwealth defendants. In their first motion to dismiss (Document #3 in the file), the defendants' premise was that plaintiff was placed in *punitive* segregation at Graterford. In answers to interrogatories (Document #16 in the file) filed after appeal and remand, then Superintendent of Graterford Johnson denied plaintiff was placed in punitive segregation and maintained that he was placed in administrative segregation because he was an untried prisoner. As we have already noted, in defendant Rundle's answer to the complaint he also maintained that plaintiff was placed in administrative segregation as a pretrial detainee. Yet, the Commonwealth defendants' post-trial brief asserts that plaintiff was placed under restriction because he was a security risk. Finally, in his post-trial affidavit in response to our Order, present Superintendent of Graterford Ronald Marks

11. Viewed as a whole, the living conditions of pretrial detainees in "B–Block Gallery, Administrative Segregation," to which plaintiff was subject while he was there, were significantly more restricted and inconvenient than the living conditions of the general prison population. Prisoners confined on B–Gallery had scantier bedding and clothing than prisoners in the general population. The temperature during the colder months in B–Gallery, although not excessively low, was lower than the temperature in other parts of the prison and living on B–Gallery was to that extent more uncomfortable. Unlike prisoners in the general population, plaintiff could not attend religious services although a priest could visit him in his cell. Unlike prisoners in the general population, while in administrative segregation plaintiff could not send registered or certified mail, and, although he could have documents notarized, they were not notarized in his presence. Unlike prisoners in the general population, plaintiff did not have access to legal materials. Unlike prisoners in the general population, plaintiff did not have general commissary privileges nor did he have access to the prison library, television, or movies. If he requested them prison officials would bring to his cell four randomly-selected books from the prison library. Medical care in administrative segregation was apparently more cursory than in other parts of the prison; plaintiff, for example, was unable to get filled a prescription for eyeglasses. While in administrative segregation, plaintiff was allowed only very short, daily exercise periods out of his cell in a small enclosure lacking any recreational facilities. Inmates in the general population could exercise much more frequently in a larger area equipped with sports and recreational facilities. Showers were available twice a week in administrative segregation as opposed to daily in the general prison area and materials offered to prisoners to clean their cells were fewer in administrative segregation than in the general prison areas. The heads of pretrial detainees on B–Gallery were shaved close. This was not done to prisoners in the general population. Finally, opportunity to work, attend school, or take vocational training, available to the general population, was denied to pretrial trainees.

## III. CONCLUSIONS OF LAW

### A. *Claim of Conspiracy Against All Defendants.*

■ Plaintiff claims a conspiracy among all defendants to harass and punish him apparently because plaintiff was accused of shooting a police officer. Except for the Commonwealth defendants' inability to produce two records, however, the record is simply devoid of any evidence, circumstantial or otherwise, of such a conspiracy.[13] No testimony at trial or documents admitted into the record suggest any bond among all defendants, except for their government employment, and certainly no evidence suggests any agreement, unity of purpose, or common design among them.[14]

listed the following as the reason for plaintiff's placement at Graterford:
(1) He was an untried prisoner.
(2) He was considered a security risk (subject was in administrative segregation not punitive).
To the end, then, the position of the Commonwealth defendants was equivocal if not downright confusing.
We recognize that some of the documents we have just listed were not admitted into evidence at trial. Accordingly, we did not rely on them in making our factual determination. We made our finding only from the evidence we catalogue in Finding of Fact No. 10.

13. We note here that by the time of trial, represented by his second appointed counsel, plaintiff seemingly abandoned some of his earlier claims, the general conspiracy theory among them. In view of the rather tortured history of this litigation, however, we will dispose of all claims on the merits.

14. For a recent Third Circuit treatment of the nature of conspiracy, *see* United States v. Kates, 508 F.2d 308 (3d Cir. 1975).

### B. Claim Against Defendants Rambo and LaSpina.

The evidence against defendants Rambo and LaSpina, the guards at Delaware County Prison who reported plaintiff's presence in the cell with the hole in its wall, is not much more substantial than the evidence of conspiracy against all defendants. Beyond plaintiff's allegations at trial that defendants changed their testimony from the arraignment to the actual trial for attempted escape,[15] plaintiff offers no other evidence bearing directly on defendants' conduct. Unfortunately, part of the record of the arraignment is missing and the Commonwealth cannot produce the record of plaintiff's trial for attempted escape. Although these disappearances may seem suspect, they are not enough alone or on this record to find defendants liable to plaintiff either individually or in combination. We conclude as a matter of law that plaintiff has not carried his evidentiary burden against defendants.

Accordingly, we enter judgment for defendants Rambo and LaSpina and against plaintiff.

### C. Claims Against Defendant Gable Individually and Against Defendants Gable and Taylor in Combination.

Plaintiff's claim against defendant Gable individually is that defendant, as Warden of Delaware County Prison, acted arbitrarily and maliciously in petitioning for his transfer to Graterford as a security risk. Plaintiff does not dispute the constitutionality of transferring a prisoner from one institution to another as a security risk; he contests the constitutionality of so doing without any justifiable reason to believe that the prisoner actually is a security risk. Plaintiff offers no evidence supporting a conclusion that defendant Gable acted arbitrarily, however. In fact, plaintiff admits that prior to his transfer he had a preliminary hearing before a judicial officer on the charge of attempted escape. Plaintiff was represented by counsel at this hearing at which defendants Gable, Rambo, and LaSpina testified. At the conclusion of the hearing, Judge Nesbitt found probable cause to hold plaintiff for trial, and the next day defendant Gable petitioned for plaintiff's transfer. Under Pa.R. Crim.P. 141(d), 19 P.S. Appendix, if the Commonwealth does not establish a prima facie case against an accused at a preliminary hearing and no reasonable grounds exist for continuance, he must be discharged. Moreover, under Pa.R. Crim.P. 141(c), at the hearing the accused has the right to counsel, to cross-examine witnesses, to present evidence, and to compel witnesses to appear and testify in his behalf. In the absence of evidence of prejudice or a "frame-up" by prison authorities, we cannot imagine a more rational and constitutional procedure for defendant Gable's determining to transfer plaintiff to Graterford as a security risk.[16]

---

15. Plaintiff testified that at his preliminary hearing, defendant LaSpina said simply that he had seen plaintiff coming out of the escape cell. Then, plaintiff testified, that defendant Rambo, corroborated by defendant LaSpina, said that plaintiff came out of the cell covered with dust and shaking debris out of his hair. (N.T. 19–20).

16. In Watkins v. Johnson, 375 F.Supp. 1005 (E.D.Pa.1974), the court found that plaintiff, placed in administrative detention for 85 days, was not denied procedural due process. As a result of violent prison disturbances plaintiff was segregated from the general prison population. One week later he was arraigned and given a preliminary hearing on charges of assault by a prisoner, assault and battery, and conspiracy. The judge found probable cause and ordered plaintiff held over for trial. Plaintiff was then returned to segregation and remained there for the rest of the 85 days. In holding that plaintiff had been afforded ample due process rights, the court found that:

> The magistrate's ruling that Jackson be held for trial, while not a pronouncement of criminal guilt, does constitute a judicial finding that the criminal charges are supported by facts which have been rationally determined and which are legally sufficient to establish a prima facie case.

Plaintiff also contests the state procedure by which he was transferred to Graterford. Plaintiff claims that under 61 P.S. § 72, the Delaware County Board of Prison Inspectors and not Warden Gable had to apply for plaintiff's transfer.[17] Since defendant Gable petitioned for the transfer and defendant Taylor approved it, plaintiff argues, they acted beyond the scope of their authority in transferring him. Plaintiff next asserts that since his illegal transfer resulted in his being confined under unconstitutional conditions at Graterford, defendants Gable and Taylor are liable to him. We cannot accept this rather finely attenuated theory. First, even if defendants did not follow the correct procedure in transferring plaintiff,[18] a state procedural error, without more, does not subject plaintiff "to the deprivation of any rights, privileges, or immunities secured by the Constitution . . ."[19] Second, except under a "but for" theory of causation, which we reject, defendants are not responsible for what went on at Graterford after the transfer.

Accordingly, judgment is entered for defendants Gable and Taylor and against plaintiff.

### D. Claim Against Defendant Zigler.[20]

Plaintiff claims that defendant John Zigler, Warden of Delaware County Prison in 1971, injured him by transferring him back to Graterford after he was acquitted of attempted escape in February 1971. Plaintiff reasons that his acquittal invalidated the original order placing him in Graterford as a security risk and that defendant Zigler was, therefore, unauthorized to transfer him back to Graterford. We note that in February 1971 plaintiff had already been convicted of robbery and placed in the general prison population at Graterford. As with defendants Gable and Taylor, however, even if defendant Zigler made a procedural error under state law, and there is absolutely no evidence of this, such an error does not rise to a constitutional level.

Accordingly, judgment is entered for defendant Zigler and against plaintiff.

### E. Claim Against Defendant Rundle.

We have found that plaintiff was placed in "B–Block, Administrative Segregation" because he was an untried prisoner or pretrial detainee (Finding of Fact No. 10). We have further found that the living conditions of prisoners on B–Gallery, taken as a whole, were significantly more restricted than those of the general prison population (Finding of Fact No. 11). Given these findings, we will now examine the question of what constitutional theory, if any, can afford plaintiff a basis for relief.

The possibility that placing pretrial detainees under more restricted and inconvenient conditions than other prisoners violates the detainees' constitutional

---

We would not expect the forthcoming decision in Preiser v. Newkirk, 499 F.2d 1214 (2d Cir. 1974), cert. granted, 419 U.S. 894, 95 S.Ct. 172, 42 L.Ed.2d 138, recently argued before the Supreme Court, to affect our holding here. The issue in *Preiser* is whether or not a prisoner transferred from a medium to a maximum security institution is entitled to any form of notice and hearing before such transfer. We feel confident that the Supreme Court will require procedural rights, if any, for prison transfers no more extensive than those provided by an arraignment and preliminary hearing in Pennsylvania.

17. *See* footnote 9 *supra* for the text of 61 P.S. § 72.

18. Defendants argue that if 61 P.S. § 72 is read in conjunction with the Act of April 11, 1866, P.L. 588, making applicable to Delaware County the Act of February 1, 1839, P.L. 10, one sees clearly that it was the intent of the State Legislature to empower the warden of Delaware County Prison to initiate transfers pursuant to 61 P.S. § 72. We see no need to resolve this dispute.

19. *Cf.* United States ex rel. Hayward v. Johnson, 508 F.2d 322 (3d Cir. 1975).

20. This claim is one of those that seems to have been abandoned by time of trial. Defendant Zigler was neither mentioned at trial nor in plaintiff's post-trial brief.

rights is one which courts are entertaining with increasing frequency.[21] The courts which have found constitutional violations of the rights of pretrial detainees, however, have not always agreed on the specific constitutional basis for their decisions.

Some courts have been urged to find that the "presumption of innocence" provides a constitutional foundation for the rights of pretrial detainees. In Blunt v. United States,[22] the District of Columbia Court of Appeals strongly rejected this urging.[23] The court did not reach the issue of the possible constitutional underpinnings of the presumption itself; instead it found:

> The importance of this presumption stems from the fact that in early English law, the accused was required to present evidence to prove his innocence.
>
> The presumption of innocence, however, has never been applied to situations other than the trial itself. To apply it to the pretrial bond situation would make any detention for inability to meet conditions of release unconstitutional.

We agree with the court that the presumption of innocence is a highly unlikely standard for the constitutional rights of pretrial detainees.

A much more likely constitutional theory on which to ground such civil rights is one based on the Eighth Amendment to the Constitution.[24] Although courts most frequently find "cruel and unusual punishment" when the prison conditions challenged are, on any scale, outrageous and barbaric,[25] in Howell v. Cataldi[26] the Court of Appeals for the Third Circuit cited with approval Jordan v. Fitzharris[27] and quoted from it the following language:

> [A] punishment may be cruel and unusual when, although applied in pursuit of a legitimate penal aim, it goes beyond what is necessary to achieve that aim; that is, when a punishment is unnecessarily cruel in view of the purpose for which it is used.

Moreover, in remanding this action to us the Court suggested that if length of restricted confinement is unrelated to the seriousness of the penal interest involved, this disproportion could violate the Eighth Amendment.[28]

Applying the Eighth Amendment to pretrial detainees, however, presents conceptual problems. Pretrial detainees have, by definition, not been convicted of any crime. Therefore, they are not yet in a position to be punished at all. To label challenged conditions of pretrial detention as either barbaric or disproportionate punishment is to assume that some form of punishment is legitimate.[29] For this reason, we do not find the Eighth Amendment to be the appropriate source for the constitutional rights of pretrial detainees.

21. *See* Rhem v. Malcolm, 371 F.Supp. 594 (S.D.N.Y.1974); Inmates of Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676 (D. Mass.1973); Inmates of Milwaukee County Jail v. Petersen, 353 F.Supp. 1157 (E.D. Wis.1973); Smith v. Sampson, 349 F.Supp. 268 (D.N.H.1972); Brenneman v. Madigan, 343 F.Supp. 128 (N.D.Cal.1972); Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark.1971).

22. 322 A.2d 579, 584 (D.C. Court of Appeals 1974).

23. *See also* Meyer, Constitutionality of Pretrial Detention, 60 Georgetown L.J. 1382, 1438–49.

24. The Eighth Amendment guarantee against cruel and unusual punishment is applied to the states through the Fourteenth Amendment. Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

25. *See, e.g.,* Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968); Wright v. McMann, 387 F. 2d 519 (2d Cir. 1967).

26. 464 F.2d 272, 281 (3d Cir. 1972).

27. 257 F.Supp. 674, 679 (N.D.Cal.1966).

28. 471 F.2d at 1202.

29. Several other courts have reached this same conclusion. *See, e.g.,* Johnson v. Glick, 481 F.2d 1028, 1032 (2d Cir. 1973); Rhem v. Malcolm, 371 F.Supp. 594, 624 n.5 (S.D. N.Y.1974); Inmates of Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676, 688 (D. Mass.1973).

Instead we believe that the source of a pretrial detainee's right not to be confined under conditions significantly more restricted than those of the general prison population is the due process clause of the Fourteenth Amendment.[30] We refer here to the constitutional guarantee of substantive due process, the right of the individual to be free from any arbitrary invasion by the State of his fundamental right to liberty.[31] The only legitimate state interest in the pretrial detention of an accused person who cannot raise bail is in guaranteeing his presence at trial. Given this legitimate interest, the State acts irrationally, arbitrarily, and constitutionally illogically when it imposes restrictions on the freedom of pretrial detainees significantly greater than those imposed on convicted prisoners. This kind of arbitrary state conduct violates substantive due process.[32]

We hold, therefore, that since the living conditions of "B–Block Gallery, Administrative Segregation," to which plaintiff was assigned in 1970 as a pretrial detainee, were significantly more restricted than those of the convicted prisoners in the general prison population and since defendant Rundle knew and approved of plaintiff's placement, defendant deprived plaintiff of his rights under the Fourteenth Amendment to the Constitution. Our holding also resolves any remaining First and Eighth Amendment claims since we view the curtailing of religious exercise and the

---

30. Some courts, who have found a due process violation, have at the same time found a violation of equal protection. *See, e.g.,* Rhem v. Malcolm, 371 F.Supp. 594, 624 (S.D.N.Y.1974). We find, however, that the equal protection clause of the Fourteenth Amendment, like the cruel and unusual punishment clause of the Eighth Amendment, is a superficially appealing but ultimately unworkable constitutional rubric under which to examine the conditions of pretrial detention. On the one hand, the pretrial detainee is, by the nature of his status, not equal to a person on bail. One is imprisoned; the other is not. In Rigney v. Hendrick, 355 F.2d 710 (3d Cir. 1965), the Third Circuit, in holding that pretrial detainees may be compelled to participate in line-ups, rejected as too broad the holding in Butler v. Crumlish, 229 F.Supp. 565, 567 (E.D.Pa.1964) that:
> The constitutional authority for the State to distinguish between criminal defendants by freeing those who supply bail pending trial and confining those who do not, furnishes no justification for any additional inequality of treatment beyond that which is inherent in the confinement itself.

On the other hand, holding that the rights of a pretrial detainee must be equal to those of a convicted prisoner forecloses the possibility that the rights of the former should be greater than those of the latter. While we do not, at this time, wish to find that a pretrial detainee must be confined under less restrictive conditions than a convicted prisoner, *see* footnote 32 *infra,* neither do we wish to apply to the problem an equal protection rationale which might foreclose our so finding in the future.

31. In its opinions over the last several years the Supreme Court has displayed a renewed inclination to frame constitutional issues in terms of substantive due process. *See, e.g.,* Cleveland Board of Education v. La Fleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *see, especially,* Roe v. Wade, 410 U.S. 113, 167–71, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (Stewart, J., concurring) and Griswold v. Connecticut, 381 U.S. 479, 502–07, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (White, J., concurring).

32. *See, e.g.,* Rhem v. Malcolm, 371 F.Supp. 594 (S.D.N.Y.1974); Inmates of Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676 (D.Mass.1973); Inmates of Milwaukee County Jail v. Petersen, 353 F.Supp. 1157 (E.D.Wis.1973); Smith v. Sampson, 349 F. Supp. 268 (D.N.H.1972); Brenneman v. Madigan, 343 F.Supp. 128 (N.D.Cal.1972); Hamilton v. Love, 328 F.Supp. 1182 (E.D. Ark.1971). These courts, in holding that the restricted conditions of pretrial detainees violate the Fourteenth Amendment, also suggest that holding pretrial detainees under the same restrictions as those on convicted prisoners might offend due process. We will not reach this question on the record before us. Plaintiff presented his evidence by comparing the conditions of pretrial detainees to those of convicted prisoners at Graterford. Neither party offered any evidence on the feasibility of placing pretrial detainees under fewer restrictions than those placed on the general prison population. The present policy at Graterford is to place pretrial detainees in with the general population.

apparently cursory medical attention received as simply two among the number of restrictions visited on pretrial detainees at Graterford in 1970.

Defendant Rundle in his answer to the complaint raises the affirmative defense of official immunity. He does not raise a separate defense of good faith in his answer although in the Commonwealth defendants' joint post-trial brief, they invoke a good faith defense citing Fidtler v. Rundle.[33] In *Fidtler* the Court of Appeals for the Third Circuit found that both defenses, immunity and good faith, were available to the superintendent of a state prison. Under Scheuer v. Rhodes,[34] Johnson v. Alldredge,[35] and *Fidtler*, however, the crucial requirement for establishing the defense of immunity or good faith is evidence on the record from which a court can determine whether or not the defense is available under a given set of circumstances. In *Scheuer* the Supreme Court emphasized that a defendant must offer evidence to support claims of immunity and good faith. Reversing and remanding the actions before it, the Court said:

> In dismissing the complaints, the District Court and the Court of Appeals erroneously accepted as a fact the good faith of the Governor . . . .. There was no evidence before the Courts from which such a finding of good faith could be properly made . . . .[36]

The Third Circuit treats the defenses of immunity and good faith separately. It finds immunity the appropriate defense for an official performing a discretionary function and good faith the appropriate defense for an official performing a non-discretionary or ministerial function. Under Johnson v. Alldredge, to establish a defense of immu-

nity, a defendant official must offer evidence, by affidavit or testimony, that the challenged action was discretionary and "within the outer perimeter of his authority."[37] In *Johnson* defendant offered his own uncontroverted affidavit and that of his immediate superior attesting to his discretionary authority. These the court found sufficient to establish immunity.[38] Defendant Rundle, however, has offered no evidence, testimonial or otherwise, in support of a defense of official immunity. We, therefore, reject his defense. Under Fidtler v. Rundle, as under Scheuer v. Rhodes, to establish a defense of good faith, a defendant official must offer some record evidence that he did, in fact, rely in good faith on a state statute, court order, or the state of the law in general.[39] Defendant Rundle neither alleged good faith in his answer to the complaint, nor did he offer any evidence by way of affidavit or testimony from which we could find good faith reliance on statute or law. Although *Fidtler* was decided about a week after trial was completed in this action, we feel no qualms in relying on it. In Safeguard Mutual Insurance Co. v. Miller,[40] the Third Circuit clearly anticipated both *Scheuer* and *Fidtler* in requiring a defendant to make a record in order to establish immunity or good faith. *Scheuer* itself was decided prior to trial. Further, in their post-trial brief, the Commonwealth defendants, among them defendant Rundle, cite *Fidtler*. Finally, all defendants objected, several months after trial, to our order requiring post-trial affidavits on the ground that we were "forcing defendants to put on evidence which counsel deemed inappropriate at time of trial."

Having rejected defendant Rundle's defenses, we find that he is lia-

---

33. 497 F.2d 794 (3d Cir. 1974).

34. 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

35. 488 F.2d 820 (3d Cir. 1973).

36. 416 U.S. at 249–50, 94 S.Ct. at 1693.

37. 488 F.2d at 825.

38. *Id.* at 825–26.

39. 497 F.2d 801–02.

40. 472 F.2d 732 (3d Cir. 1973).

ble in damages to plaintiff. We find, however, that only nominal damages are appropriate here.[41] Although plaintiff alleged that malice motivated the conduct of all defendants, he offers no evidence to support his allegation against any defendant. Thus we find that defendant Rundle's conduct does not rise to a level at which punitive damages would be appropriate. Neither will we award actual damages. The only possible basis for actual damages in this action is the loss of wages plaintiff alleges because he was denied the opportunity to work while in pretrial detention. Although the Commonwealth defendants offer no evidence on the feasibility or non-feasibility of providing pretrial detainees the opportunity to work, we are unprepared, on this record, to grant damages to a pretrial detainee solely on the ground that he had no opportunity to work. In the best of all possible judicial systems, the system would function so efficiently that a prison might not have time to place a pretrial detainee into a work program.[42]

Based on our findings of fact and conclusions of law, then, we now enter judgment on the complaint for plaintiff and against defendant Rundle. Defendant will pay plaintiff five hundred dollars in nominal damages.

We are extremely grateful to Lewis Lieberman, the law student from the University of Pennsylvania Law School appointed to represent plaintiff. His thorough preparation for trial and excellent post-trial brief greatly aided us.

41. For a discussion of damages in civil rights actions, *see* Basista v. Weir, 340 F.2d 74 (3d Cir. 1965). In *Basista* the Third Circuit held that "the federal common law of damages commands the issue of damages" in an action brought under 42 U.S.C. § 1983. 340 F.2d at 87. The Court further held that "it is not necessary to allege nominal damages and nominal damages are proved by proof of deprivation of a right to which the plaintiff was entitled." *Id.*

42. We are aware of the Thirteenth Amendment issues raised by compulsory prison work programs. Section 141 of 61 Purdon's Statutes reads:
> At the expiration of existing contracts, the board of inspectors, wardens, or other officers of state prisons and reformatory institutions, are directed to employ the convicts under their control for and in behalf of the state.

In Fidtler v. Rundle, Civil Action No. 69-2287 (E.D.Pa. May 7, 1973), an unsentenced prisoner raised a constitutional challenge to the statute. Although the court held that the term "convicts" in the statute includes convicted but unsentenced prisoners as well as those both convicted and sentenced, it did not reach the question of the constitutionality of the statute. Instead it found defendant had relied in good faith on the statute and denied liability. The Court of Appeals for the Third Circuit reversed and remanded for evidentiary proceedings on the issue of good faith reliance, and it also avoided the constitutional question. Fidtler v. Rundle, 497 F.2d 794 (3d Cir. 1974). Thus the substantive issues remain unresolved.

Defendants in this action raise the specter of involuntary servitude should we find that denying plaintiff the opportunity to work is, in itself, an unconstitutional restriction on pretrial detainees. We do not so hold, but our decision is unrelated to the Thirteenth Amendment. Plaintiff argues only that he should be offered the opportunity to work not that he should be compelled to work. Although the word "convicts" in 61 P.S. § 141 would seem clearly to exclude an unconvicted prisoner, we are simply not concerned here with a compulsory work program.

While denying plaintiff the access to work and training programs provided to other prisoners obviously restricts plaintiff, we find insufficient evidence in the record to hold that such restrictions, by themselves, are unconstitutional. Pretrial detainees are transient, hopefully increasingly so. A strong showing by prison authorities that placing such transient prisoners in work and training programs would impose a substantial burden on the prison system and confer minimal benefits on pretrial detainees might justify such restrictions.