Leroy THOMPSON, Appellant,

v.

Parole Supervisor BURKE, Pennsylvania Parole Board Member Jefferson, and Parole Agent Strickler, Appellees.

No. 75–1365.

United States Court of Appeals, Third Circuit.

Argued Oct. 5, 1976.

Decided June 1, 1977.

**232**

Jane D. Elliott, Duane, Morris & Heckscher, Philadelphia, Pa., for appellant.

Lawrence Barth, Asst. Atty. Gen., Philadelphia, Pa., Michael von Moschzisker, Deputy Atty. Gen., Eastern Regional Director, Robert P. Kane, Atty. Gen., Philadelphia, Pa., for appellees.

Before VAN DUSEN, BIGGS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

█ The appellant, Thompson, a state parolee, brings this appeal from an adverse directed verdict in a civil action for damages brought pursuant to 42 U.S.C. § 1983. Thompson alleges that the procedure of the Pennsylvania Board of Parole and Pardon (Board) and of Member Jefferson violated the Fourteenth Amendment guarantee of procedural due process as set out and defined by the United States Supreme Court in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (decided June

29, 1972). Thompson seeks damages from Board member Jefferson, Parole Supervisor Burke, and Parole Agent Strickler. We affirm the directed verdict in favor of Burke and Strickler for no evidence was presented showing them to be culpable of any violation of the statute. The Board, of course, cannot be sued for it is not a "person" within the meaning of Section 1983. *Fear v. Commonwealth of Pennsylvania,* 413 F.2d 88 (3d Cir.), *cert. denied,* 396 U.S. 935, 90 S.Ct. 278, 24 L.Ed.2d 234 (1969). Facts are stipulated as follows:

"1. On June 16, 1971 plaintiff was sentenced before the Philadelphia Court of Common Pleas to a term of 6 months to 5 years for the offenses of Burglary, Larceny and Receiving Stolen Goods. [*Burglary,* 18 P.S. (Appendix) § 4901.] Plaintiff was also sentenced to concurrent terms of probation on other charges. On June 16, 1971 plaintiff entered the State Correctional Institution at Graterford to begin serving his sentence.

"2. On September 27, 1971 the Pennsylvania Board of Probation and Parole (hereafter referred to as the Parole Board) granted plaintiff parole. On that same day plaintiff was released to the Eagleville Hospital and Rehabilitation Center.

"3. On October 7, 1971 plaintiff was discharged from the Eagleville Hospital and Rehabilitation Center.

"4. On June 22, 1972 plaintiff was arrested in Philadelphia and charged with Burglary and related offenses. On that same day a Warrant to Commit and Retain [1] was issued by the Philadelphia District Office of the Parole Board.

"5. On July 11, 1972 plaintiff was interviewed by an agent [Bednarczyk] of the Parole Board at the Philadelphia Detention Center. On September 27, 1972 the Parole Board in Executive Session ordered plaintiff returned as a technical parole violator pending disposition of open charges.

---

1. This unaccustomed word is not found either in the regulations of the Board or elsewhere in Pennsylvania law. We assume that the word

"*R*etain" was meant to be detain. (Emphasis added).

"6. On October 20, 1972 the Parole Board in Executive Session voted to recommit plaintiff as a technical parole violator.

"7. Plaintiff's trial on the charges lodged against him on June 22, 1972 was listed for December 12, 1972; January 18, 1973; March 20, 1973 and May 18, 1973. On each of these dates the trial was postponed.

"8. On April 26, 1973 the Parole Board in Executive Session rescinded its recommitment action of October 20, 1972 and recommended that plaintiff be allowed to post bond for his release on the condition that plaintiff formulate a complete parole plan and submit to intensive supervision. Plaintiff was unable to meet these conditions and consequently was not released.

"9. On May 30, 1973 plaintiff was finally tried before the Philadelphia Common Pleas Court on the charges arising out of the June 22, 1972 arrest. He was found guilty and sentenced on July 12, 1973 to a term of 11½ to 23 months and consecutive terms of probation. On July 13, 1973 plaintiff was returned to the State Correctional Institution at Graterford.

"10. During the late afternoon of August 6, 1973 plaintiff received notice that the Parole Board intended to hold on August 8, 1973 a hearing for plaintiff as a convicted parole violator. This notification was sent by Mr. Thomas J. Feeney, Parole Case Specialist at the State Correctional Institution at Graterford.

"11. On August 8, 1973 plaintiff was interviewed by Mr. Ernest Conley, Parole Board Member. On August 17, 1973 the Parole Board met in Executive Session and voted to recommit plaintiff as a convicted parole violator.

"12. On September 25, 1973 plaintiff filed this lawsuit in the Federal District Court for the Eastern District of Pennsylvania.

"13. On October 10, 1973 plaintiff received notice from the Parole Board that it had recommitted him as a convicted parole violator."

It is necessary to state further facts. A jury trial was held. Thompson testified that after his arrest on June 22, 1972, he had a meeting with Jefferson, the Parole Board member, on September 19, 1972, at the Philadelphia Detention Center. Thompson testified that Jefferson came to the Detention Center with a public defender. Thompson related that he discussed with Jefferson the parole detainer and what had happened to him.[2] On cross-ex-

---

2. Thompson testified that:

"Mr. Jefferson came to the Detention Center along with a public defender . . . I had signed the acknowledgment that I wanted the defender to represent me . . ." (N.T. 51).

". . . Mr. Jefferson asked me about what had I discussed with the agent that came to see me; did I admit to a violation of anything, or something like that, and I told him I couldn't remember admitting to any violation or anything like that, and not to—and he said, 'You know you are charged with using drugs and absconding.' And I said that I don't know how these facts came about, but I discussed with Mr. Jefferson that I was in the hospital where he could check, and everything, and why I left Eagleville, and why Mr. Strickler suspected me of using drugs was because the letter he received from Eagleville stated that they suspected me of using drugs.
Q. O.K., Mr. Thompson. Do you know what a parole hearing is?
A. Not really, but I know—not more than I have heard.

"Now were there any other occasions on which you appeared before a member or several members of the Parole Board?
A. Not that I can remember. Just this one time in the Detention Center when Mr. Jefferson came to see me." (N.T. 52–53) Again, at N.T. 61, Thompson testified:
"Well, there was a member from the Defender's Association supposed to have been to represent me, and Mr. Jefferson. I seen them both at the same time, and they came, and they were the only two there, other than myself. Mr. Jefferson asked me about what were the charges about, and I explained to him what my—to my knowledge what I thought, and what he had asked me if I admitted anything about a violation to anyone. I told him no. And he asked me about did I have any reason to know why, or believe why Mr. Strickler put the detainer on me, and I told him that I don't know, except certain things that I have told you earlier about the drug thing. And he said, 'Well, has Mr. Strickler been out to your house?' And I

amination Thompson testified that he received no prior notice of the meeting with Jefferson.[3]

As appears from the stipulation there was a meeting of the Board on September 27, 1972, and Thompson was ordered returned to Graterford Prison on a "technical" parole violation. The record shows that on October 20, 1972, there was a meeting of the Parole Board in Executive Session and the Board voted to recommend recommitment of Thompson as a "technical" parole violator. There is nothing in the record that shows that Thompson had a hearing before the Board,[4] as opposed to the meeting with Jefferson.

The defendants did not appear at trial. The only witness they called was David J. Baker, Parole Supervisor I, with the Philadelphia District Office. Mr. Baker's testimony is noteworthy in that it explained the position of the defendants. Mr. Baker was asked whether the hearings allegedly given to Thompson were in accordance with *Morrissey.* He answered, "No." (N.T. 123). The following exchange then took place:

"Q. Were the so-called Morrissey hearings [sic]—First off let me establish do you know what a Morrissey hearing is?

A. Yes.

Q. Were these so-called Morrissey hearings in effect within the State of Pennsylvania at the time?

A. No.

\* \* \* \* \* \*

"Q. When did they go into effect in the State of Pennsylvania?

A. They went into effect, effective date, *Morrissey v. Brewer,* was June 8, 1972.

Q. Would that mean people arrested after that date would be afforded so-called Morrissey hearings?

A. Right.

Q. Whereas people arrested before that date would have some other type of hearing.

A. Correct.

Q. Which category did Mr. Thompson go into?

---

said no, and he said how—anyway, he said that he believed Mr. Strickler was wrong and he would get back to me. He would release me, or something like that, you know."

3. On cross-examination, Thompson testified:
"Q. Did you know that Mr. Jefferson was going to come and see you?
"A. I didn't know until he came. I didn't get no notice of anything unless it was the one I had there, and I think that was after Mr. Jefferson came when they committed me."
N.T. 69, and
"The Court: . . . Did you receive a notice of any kind before Mr. Jefferson visited you in September of 1972?
"The Witness: I don't believe so."
N.T. 70, and
"The Court: . . . Calling on your present recollection, did you receive the notice which you have in your file dated October 2, 1972, before you met with Mr. Jefferson? What is your present recollection?
"The Witness: My present recollection is I received it after I met Mr. Jefferson.
"The Court: That is now his testimony. He received this notice after he had his meeting with Mr. Jefferson."
N.T. 77.
On redirect examination, Thompson conceded that Mr. Jefferson had written him a letter

on Pennsylvania Parole Board stationery showing "John H. Jefferson, Member" dated December 13, 1972, stating that Thompson's meeting with him had been on September 6, 1972 (N.T. 81).

4. There would appear to be a confusion of dates here unless it be assumed that the Parole Board's order of September 27, 1972 did not commit Thompson to prison.
On June 22, 1972, a warrant to "Commit and Retain" was issued by the Philadelphia District Office of the Parole Board. (Stipulation 4). On July 11, 1972, plaintiff was interviewed by an agent of the Parole Board and the Parole Board on September 27, 1972 ordered him returned [to where?] as a technical parole violator pending disposition of open charges. (Stipulation 5). On October 20, 1972 the Parole Board in Executive Session voted to recommit the plaintiff as a technical parole violator. It is not clear to what institution the Parole Board committed Thompson. (Stipulation 6). There appears to be some confusion as to the dates of his commitments and the places to which he was committed.
Plaintiff's trial on the burglary charge was listed on five different occasions between December 12, 1972 and May 30, 1973.

A. People arrested prior to the Morrissey decision."

N.T. 124.[5]

## II. THOMPSON'S CLAIM

Thompson asserts that he is entitled to damages because upon his arrest for his second crime of burglary and related offenses he could not get bail by reason of the fact that the Parole Board had revoked his parole on technical grounds and incarcerated him.

## III. ISSUES AND DISCUSSION OF LAW

A number of difficult issues are present and are discussed hereinafter.

### A. Decision of the district court.

The learned district judge did not write an opinion but there was extended colloquy. See N.T. 172, *et seq.* The substance of the court's decision, as we distill it from the colloquy, was that the doctrine of *Morrissey, supra,* was not applicable but even if it were applicable the Parole Board and its members had substantially followed its precepts. He discharged the jury in effect informing its members that the case presented only issues of law to be decided

by the court. He granted a directed verdict to all the individual defendants pursuant to Rule 50(a), F.R.C.P., 28 U.S.C.

In these conclusions the District Court was in error. It is obvious from the record that *Morrissey* has not been complied with. Mr. Chief Justice Burger stated in *Morrissey*: "The parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation." *Morrissey, supra,* 408 U.S. at 488, 92 S.Ct. at 2603. The Supreme Court prescribed among other required provisions "(d)", "(e)", and "(f)", as follows: "(d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." *Id.* at 489, 92 S.Ct. at 2604. Items "(d)" and "(f)" were not complied with by the Parole Board, and indeed, as we have stated, there is nothing in the record to show that Thompson ever had a hearing before the Board.[6, 7]

---

5. Mr. Baker's confusion as to dates is obvious. The date of decision of *Morrissey* was June 29, 1972. Thompson was arrested on June 22, 1972.

6. In *Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), Mr. Chief Justice Burger defined the issues of *Morrissey,* as follows: "In *Morrissey,* we held that the conditional freedom of a parolee generated by statute is a liberty interest protected by the Due Process Clause of the Fourteenth Amendment which may not be terminated absent appropriate due process safeguards." *Id.* at 85, 97 S.Ct. at 278. In Mr. Justice Stevens' dissenting opinion, joined in by Mr. Justice Brennan, it is stated: "Accordingly, . . . the parolee's constitutional right to have the revocation hearing conducted fairly is not affected by his custodial status. Moreover, since the parole revocation process begins when the Parole Commission issues the revocation warrant, it plainly follows that the constitutional protections afforded the parolee attach at that time." *Id.* at 90, 97 S.Ct. at 281 (Stevens, J., dissenting) (notes omitted).

7. The inartistic *pro se* complaint filed by Thompson, the answer thereto, the transcript of the testimony, and indeed the whole record proves conclusively that in assuming jurisdiction the district court did not fall into the jurisdictional trap discussed in *Rizzo v. Goode,* 423 U.S. 362, 373–376, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), citing *Hague v. C.I.O.,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). See also *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

We set out below pertinent portions of the complaint.

"The defendant, Jefferson, is a Pennsylvania Board of Parole member, and as such did willingly, knowingly accept the false information as to the aledged [sic] charges made and fabricated against the Plaintiff, by the defendant, Parole agent Strickler. Defendant, Pennsylvania Board of Parole, member Jefferson, at last did give the Plaintiff a belated Hearing, on the un-proven, hearsay, and fabricated trumped up aledged [sic] charges of defendant Prole [sic] agent Strickler, and willingly, knowingly, and

Title 42 U.S.C. § 1983, upon which Thompson relies, provides that "[e]very person" who acts under color of state law to deprive another of a constitutional right shall be answerable to that person in a suit for damages. After *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (3/2/76), it seems almost unnecessary to state that very numerous exceptions have been carved out of the apparently absolute terms of § 1983. Cf. *Helstoski v. Goldstein*, 552 F.2d 564 (3d Cir., filed Mar. 28, 1977) (Per Curiam). The issue of immunity of members of the Parole Board was raised for the first time by appellees at the argument. Both sides have responded with briefs at our request.[8]

There are, of course, a number of reasons for bestowing immunity upon officers of the executive branch of a state, "the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts per-

formed in the course of official conduct." *Scheuer v. Rhodes*, 416 U.S. 232, 247–248, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974), citing Mr. Justice Holmes in *Moyer v. Peabody*, 212 U.S. 78, 85, 29 S.Ct. 235, 53 L.Ed. 410 (1909).

No doubt can be entertained that probation officers and Pennsylvania Parole Board members are entitled to quasi-judicial immunity when engaged in adjudicatory duties.[9] This has been repeatedly held by courts of appeal and district courts, though not by the Supreme Court, insofar as we are aware. See *Cruz v. Skelton*, 502 F.2d 1101 (5th Cir. 1974); *Keeton v. Procunier*, 468 F.2d 810 (9th Cir. 1972), *cert. denied*, 411 U.S. 987, 93 S.Ct. 2276, 36 L.Ed.2d 965 (1973); *Burkes v. Callion*, 433 F.2d 318 (9th Cir. 1970), *cert. denied*, 403 U.S. 908, 91 S.Ct. 2217, 29 L.Ed.2d 685 (1971); *Silver v. Dickson*, 403 F.2d 642 (9th Cir. 1968), *cert. denied*, 394 U.S. 990, 89 S.Ct. 1477, 22 L.Ed.2d 765 (1969); *Joyce v. Gilligan*, 383 F.Supp. 1028 (N.D.Ohio 1974), *affirmed without opinion*, 510 F.2d 973 (6th Cir. 1975); *Morrow v. Igleburger*, 67 F.R.D. 675, 682–683 (S.D.Ohio, 1974), and, in this circuit, *United States ex rel. Nuble v. Boor*, C.A. No. 74–1708 (E.D.Pa., filed Oct. 9, 1975); *Reiff v. Commonwealth of Pennsyl-*

---

with malice, did accept said charges against the plaintiff without any presentation of proof of the charges whatsoever, and did deny the Plaintiff a fair and impartial Hearing.

    \*    \*    \*    \*    \*    \*

"The defendants herein without any reason's [sic.] and/or justification, especially defendant, Parole agent Strickler, and all the defendants as mentioned herein, who are acting under color of law and/or under law, are acting in a complete [sic] unfair manner that is utterly devoid of even the barest semblance of *Procedure* [sic] *Due Process of Law.* When the Plaintiff is innocent until proven guilty.

    \*    \*    \*    \*    \*    \*

"The Plaintiff states, that the named defendants herein did willfylly, [sic] afore-throught [sic] knowingly and with malice, discuss the Plaintiff's case prior to infringing on and against the rights of the Plaintiff. And thus, in so doing, are in complete violation of abuse of those; the inherent rights of the Plaintiff, Leroy Thompson."

"Therefore, the defendants, Parole Supervisor Burke, Parole agent Strickler, Pennsylvania Board of Parole, member Jefferson and the Pennsylvania Board of Parole Member's are

equally and collectively guilty of the offenses as stated herein by the Plaintiff, Leroy Thompson."

**8.** It is the law that where an issue has not been raised in the trial court it will not be considered on appeal unless the point is so fundamental or prejudicial that not to consider it could result in a gross miscarriage of justice. See *Callwood v. Callwood*, 233 F.2d 784, 788 (3d Cir. 1956), and *McNello v. John B. Kelly, Inc.*, 283 F.2d 96, 102–103 (3d Cir. 1960). The rule stated in the first sentence is only one of practice and may be dispensed with as justice may require. *Mayberry v. Maroney*, 529 F.2d 332, 337 (3d Cir. 1976) (Gibbons, J., concurring), and *Franki Foundation Co. v. Alger-Rau & Associates, Inc.*, 513 F.2d 581, 586 (3d Cir. 1975). The issue of immunity obtrudes here so positively that it must be discussed on appeal.

**9.** See *Helstoski v. Goldstein, supra*; *Skehan v. Board of Trustees*, 538 F.2d 53, 62 n. 17 (3d Cir.) (en banc), *cert. denied*, 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976).

vania, 397 F.Supp. 345 (E.D.Pa.1975); *Robinson v. Largent,* 311 F.Supp. 1032 (E.D.Pa. 1970); and *Paige v. Pennsylvania Board of Parole,* 311 F.Supp. 940 (E.D.Pa.1970), cf. *Pugh v. Klinger,* C.A. No. 71–2839 (E.D.Pa., filed Aug. 30, 1976); and *Jones v. Johnson,* 402 F.Supp. 992 (E.D.Pa.1975).[10, 11]

### B. Specific Issues of Immunity Presented.

There are two grounds whereby Parole Board Member Jefferson possibly may attain immunity despite his failure and the failure of the Board to follow the teaching of *Morrissey.*

*First,* this Court has on occasion pointed out the difference between adjudicatory and administrative acts of public officials in respect to immunity. See and compare *Cambist Films, Inc. v. Duggan,* 475 F.2d 887 (3d Cir. 1973) (Per Curiam) and *id.* at 890 (Van Dusen, J. concurring).[12] See *Scheuer v. Rhodes, supra,* 416 U.S. at 238–249, 94 S.Ct. 1683; *Fidtler v. Rundle,* 497 F.2d 794, 802 (3d Cir. 1974). This circumstance was specifically referred to in *Imbler, supra,* 424 U.S. at 430, 96 S.Ct. at 995, under heading "IV" as follows: "It remains to delineate the boundaries of our holding. As noted, *supra,* at 416, 96 S.Ct. 984, the Court of Appeals emphasized that each of respondent's challenged activities was an 'integral

part of the judicial process.' 500 F.2d 1301, at 1302. The purpose of the Court of Appeals' focus upon the functional nature of the activities rather than respondent's status was to distinguish and leave standing those cases, in its Circuit and in some others, which hold that a prosecutor engaged in certain investigative activities enjoys not the absolute immunity associated with the judicial process, but only a good-faith defense comparable to the policeman's. See *Pierson v. Ray,* 386 U.S. at 557, 87 S.Ct. 1213. *We agree with the Court of Appeals that respondent's activities were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force. We have no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate. We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983.*" (Notes omitted). (Emphasis added).

The work of a Pennsylvania State Parole Board member certainly includes facets of quasi-judicial duties in affecting the length of sentences, nonetheless they are not judi-

10. See, for example, the award of qualified immunity for executive and administrative officers, *Scheuer v. Rhodes, supra;* absolute immunity for judges, qualified immunity for policemen, *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); absolute immunity for legislators, *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). There have been very numerous law review articles on this subject, one of the most concise and helpful of which is in Volume 89, No. 1, of the Harvard Law Review, in the report of *The Supreme Court, 1974 Term,* at p. 219, *et seq.* See also, McCormack, *Federalism and Section 1983: Limitations on Judicial Enforcement of Constitutional Protections,* Part I, 60 Va.L.Rev. 1, 10–17 (1974); Comment, *Civil Liability of Subordinate State Officials Under the Federal Civil Rights Acts and the Doctrine of Official Immunity,* 44 Calif.L.Rev. 887 (1956); Note, *The Doctrine of Official Immunity Under the Civil Rights Acts,* 68 Harv.L.Rev. 1229 (1955); Note, *The Proper Scope of the Civil Rights Acts,* 66 Harv.L.Rev. 1285, 1295–1300 (1953).

11. It has been suggested that the provisions of § 1983 would be more appropriately applicable to cases involving injunctive relief and this observation would seem to be a valid one. Cf. 2 Harper & James, *The Law of Torts,* §§ 29.9, 29.10, at 1634–1646 (1956); Jaffe, *Suits Against Governments and Officers: Damage Actions,* 77 Harv.L.Rev. 209 (1963). There is, however, ample authority supporting suits for damages as distinguished from injunctive relief. *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and note the specific provision of § 1983 "in a suit for damages."

12. The *Per Curiam* opinion was decided in the context of the common law immunity conferred by the law of Pennsylvania. See Judge Van Dusen's concurring opinion at 891. See *Imbler, supra,* 424 U.S. at 420–421, 96 S.Ct. 984. See and compare *Safeguard Mutual Insurance Co. v. Miller,* 472 F.2d 732 (3d Cir. 1973).

cial officers.[13] They are in reality executive officers carrying out the policy of the State in respect to probation and parole. In *Scheuer, supra,* 416 U.S. at 238–239, 94 S.Ct. at 1687, the following statement is made: "The Court of Appeals relied upon the existence of an absolute 'executive immunity' as an alternative ground for sustaining the dismissal of the complaints by the District Court. If the immunity of a member of the executive branch is absolute and comprehensive as to all acts allegedly performed within the scope of official duty, the Court of Appeals was correct; if, on the other hand, the immunity is not absolute but rather one that is qualified or limited, an executive officer may or may not be subject to liability depending on all the circumstances that may be revealed by evidence."

■ In view of the immunity of federal officials acting in like capacity as parole officers or members of parole boards, we think there can be no question that there is qualified immunity for executive officers of a State government acting in good faith.

**13.** Parole Board members in effect perform quasi-judicial functions for they can affect length of terms of imprisonment and times when convicts may be paroled or discharged. *See Fidtler v. Rundle, supra,* at 798–799, 800–802.

   The Supreme Court in *Scheuer,* 416 U.S. at 249–250, 94 S.Ct. at 1693, stated: "In dismissing the complaints, the District Court and the Court of Appeals erroneously accepted as a fact the good faith of the Governor . . .. There was no evidence before the Court from which such a finding of good faith could be properly made." What was said by the Supreme Court on this point in *Scheuer* is applicable to the instant case. But see, however, *Safeguard Mutual Insurance Company v. Miller, supra,* in which we applied the principles of both immunity and good faith defense in respect to officials of the Pennsylvania Insurance Department. As was stated by Judge Adams in *Fidtler, supra,* at 801: "With respect to the good faith defense, Judge Gibbons, citing *Bivens,* indicated that the officials had the burden of pleading and proving that they had a reasonable good faith belief that their actions were lawful." (note omitted).

**14.** *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); *Johnson v. Alldredge,* 488 F.2d 820 (3d Cir. 1973), *cert. denied,* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974); and *Bivens v. Six Unknown Named Agents,*

See *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes, supra,* 416 U.S. at 247–249, 94 S.Ct. 1683; *Skehan v. Board of Trustees,* 538 F.2d 53, 61–62 (3d Cir.) (en banc), *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976).[14]

As we have stated, the appellant testified that he met Jefferson in September 1972, though other evidence indicated that this meeting might have occurred in October 1972.[15] The district court found that that meeting constituted a hearing complying with *Morrissey,* even though Thompson testified that he received no notice of the meeting [16] and defendants' (appellees here) only witness, Baker, testified that the hearings given to Thompson were not in accordance with *Morrissey.*[17] Although there was no positive evidence that the October 20, 1972, revocation of parole by the Parole Board, based on a "technical" parole violation, was based on anything presented to it by Jefferson, this inference is clearly justified from Jefferson's December 13, 1972, letter.[18]

456 F.2d 1339 (2d Cir., March 8, 1972), following remand by the Supreme Court, *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (June 21, 1971).

**15.** See note 2 and accompanying text *supra.*

**16.** See note 3 *supra.*

**17.** See text accompanying note 5 *supra.*

**18.** The letter dated December 13, 1972 from Jefferson to Thompson provided:

"Dear Mr. Thompson:

   "In reply to your letter of December 5, 1972, I regret the misunderstanding on your part in which you state that on September 6, 1972, when I interviewed you at Holmesburg Prison, you were given the impression that you would be released pending disposition of your charges.

   "I am quite certain that I informed you that as one Member of the Parole Board, I could not make a definite decision in your case. It is noted that the Board, in Executive Session on October 20, 1972, voted to recommit you as a Technical Parole Violator pending disposition of your charges.

   "According to information in front of me at this time, it is noted that you are scheduled for

■ In view of the appellant's unrefuted testimony as to his meeting with Jefferson, and in view of the ambiguity in the record surrounding the question of precisely what the Parole Board relied upon in reaching its decisions, we feel that Jefferson had a duty to come forward with evidence clarifying and amplifying the record as to what transpired at the alleged September or October hearing. Because the record does not make clear what action, if any, was taken by Jefferson, as opposed to the Parole Board, insofar as granting a hearing of the type contemplated by *Morrissey* is concerned, it is necessary to reverse the judgment and remand for further proceedings to produce a more adequate record of what transpired at the alleged hearing.[19]

■ *Second,* even if it be decided that Jefferson's failure to act was not adjudicatory and, therefore, not entitled to quasi-judicial immunity, but nevertheless reasonable, in good faith, without malice, and in reliance upon state law, he may be entitled to a *"Strickland"* defense and be relieved of liability. *Wood v. Strickland, supra,* 420 U.S. at 313–322, 95 S.Ct. 992, and authorities cited in *n.*7 at 315, 95 S.Ct. 992. The burden of proving that he acted reasonably, in good faith, without malice, and with the state law in mind, is on Parole Board Member Jefferson.[20] *Skehan v. Board of Trustees, supra,* at 59–62.

In the *Skehan* decision of June 21, 1976 this Court, en banc, stated:

"Following the remand in *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), in which the Court did not reach the issue of official immunity, the Second Circuit held that federal police officers were not immune from suit, but had a defense, on which they would have the burden of proof, that they acted with probable cause, or in good faith and with a reasonable belief in the legality of their actions. *See* 456 F.2d 1339, 1347–48 (2d Cir. 1972). In *Safeguard Mutual Insurance Co. v. Miller,* 472 F.2d 732 (3d Cir. 1973), this court adopted the same approach, holding that since good faith was a matter of defense it could not be determined on a Rule 12(b)(6) motion. *Accord, Fidtler v. Rundle,* 497 F.2d 794 (3d Cir. 1974). *Wood v. Strickland* and *O'Connor v. Donaldson* appear not to have made any change in the law in this respect." We therefore hold that in § 1983 actions the burden is on the defendant official claiming official immunity to come forward and to convince the trier of fact by a preponderance of the evidence that, under the standards of *Wood.v. Strickland,* official immunity should attach. On remand the district court must determine whether the defendants met their burden of establishing (1) that they did not know and reasonably need not have known that depriving Skehan of a pretermination hearing violated due process, and (2) that they acted without malicious intention to deprive him of his constitutional rights or cause him to suffer other injury. Whether those determinations can be made on the present record, or can be made in a motion for summary judgment under Rule 56, Fed.R.Civ.P., are questions we leave to the district court in the first instance. *See Economou v. United States*

trial on December 14, 1972, Room 602, City Hall, Philadelphia, Pennsylvania. After disposition of your charges, the Board will take a further look at your case and a decision will be made at that time.
"Wishing you success in your current problem, I remain
  "Sincerely yours,
   For the Board
   (s) John H. Jefferson
   John H. Jefferson
   Member"
Plaintiff's [Appellant's] Exhibit 4.

**19.** The Supreme Court has made it clear that constitutional issues are not to be decided on inadequate records. See *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971); *Cowgill v. California,* 396 U.S. 371, 90 S.Ct. 613, 24 L.Ed.2d 590 (1970); *DeBacker v. Brainard,* 396 U.S. 28, 90 S.Ct. 163, 24 L.Ed.2d 148 (1969); *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948); and *Honeyman v. Hanan,* 300 U.S. 14, 25, 57 S.Ct. 350, 81 L.Ed. 476 (1937).

**20.** The applicable Pennsylvania statutes under which Jefferson was acting may be found in 61 P.S. §§ 331.21, 331.21a, and 331.27.

*Department of Agriculture,* 535 F.2d 688, at 696 (2d Cir. 1976).

"While we can give guidance to the district court as to where various burdens lie on the *Wood v. Strickland* qualifications, we are less confident of our ability to suggest by what criteria the reasonableness of the several defendants' lack of knowledge of due process requirements should be measured. The district court will be required to inquire into the status and responsibility of each individual defendant and to determine whether, for example, a trustee should be held responsible for the same level of knowledge of constitutional rights as a college president or a commissioner of education. The determination may turn on the relative availability to each defendant of counsel, as well as the relative certainty of the legal issue, a criterion to which the *Wood v. Strickland* Court expressly adverted. 420 U.S. at 322, 95 S.Ct. 1612. The federal courts will be entering largely unchartered waters here, for the pre-existing rule of unqualified official immunity meant that very little if any case law was developed with respect to standards of liability for negligent mistakes of law by persons making nonjudicial adjudications. Cf. *Paton v. LaPrade,* 524 F.2d 862, 872–73 (3d Cir. 1975).

"*O'Connor v. Donaldson* describes *Wood v. Strickland* as a 'decision on the scope of the qualified immunity possessed by state officials . . . .' 422 U.S. at 577, 95 S.Ct. at 2494. Since that decision, however, the Court clarified the picture by its holding in *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), that the common law unqualified immunity of judicial officers remains undisturbed. Thus *Bauers v. Heisel,* 361 F.2d 581 (3d Cir. 1966) (en banc), which overruled *Picking v. Pennsylvania R.R.,* 151 F.2d 240 (3d Cir. 1945), still governs with respect to judicial officers. But nonjudicial, executive branch state officials can be sued for damages and must, if a violation of constitutional rights is found, defend on the grounds announced in *Wood v. Strickland.*[17]

[17] Whether an executive branch official enjoys judicial immunity will of course be determined by the nature of his functions, and not by the label that is attached to them."

*Skehan v. Board of Trustees, supra* at 61–62. See also *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), and *Smith v. Losse,* 485 F.2d 334, 344 (10th Cir. 1973) (*en banc*), *cert. denied,* 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974), and *Hayes v. Cape Henlopen School District,* 341 F.Supp. 823, 829 (D.Del.1972). Despite the fact that most of the authorities cited in footnote 7 of *Strickland,* deal with actions of school boards, the principle enunciated would seem applicable to the case at bar.

## IV. PROCEEDINGS ON REMAND

For determination of the issues under sections A and B, *supra,* it is necessary to remand the case for a fuller record and for findings and conclusions by the trial court.

## V. DAMAGES

If the district court on remand finds Jefferson liable, Thompson's position appears to fall within the ambit of *United States ex rel. Tyrrell v. Speaker,* 535 F.2d 823, 827 (3d Cir. 1976). We call attention to the language of *Tyrrell* at 829, under the heading, "IV.", "The Award of Damages," where this court in effect approved a judgment in favor of Tyrrell but held that where nominal damages are to be awarded, the amount should be $1.

## VI. CONCLUSION

Accordingly, the judgment will be reversed and the case remanded with instructions to proceed in conformity with this opinion.